ROBINSON and others *v.* M. and H. FRANKEL.

(*Nashville.* February 25th, 1887.)

1. FRUDULENT CONVEYANCE. *Relationship is not a badge of fraud. Its effect.*

Relationship of the parties to a conveyance is not, of itself, a badge of fraud; but a fact, which naturally awakens suspicion, and lends greater weight to other unfavorable circumstances, and renders necessary fuller and more distinct proof of the consideration and fairness of the transaction.

Case cited and approved: Bumpas *v.* Dotson, 7 Hum., 317.

(See Sporrer *v.* Eifler, 1 Heis., 633.)

2. SAME. *Sale by failing debtor of his entire property to an irresponsible purchaser, on long credit, without security.*

A sale by a failing debtor of all his property to an irresponsible purchaser, on long and unusual credit, without security, is one which is not safe nor calculated to be beneficial to either the debtor or his creditors, and is therefore an unmistakable badge of fraud.

Cited: Bump on Fraud. Con., 89, 92, 93; 2 Johns. Ch. Rep., 300.

3 SAME. *Case in judgment.*

A failing debtor sold to his brother, who resided in a distant State, all his available assets, consisting of merchandise of large value, in consideration of a large and suspicious debt claimed by the purchaser, and a further sum, equal in amount to all his other debts. For this latter amount the purchaser gave his notes, without security, payable to the failing debtor six, twelve, eighteen, and twenty-four months after date. These notes were assigned to a trustee for the benefit of the other creditors. The purchaser was irresponsible, and, except the goods purchased, had no means to pay his notes.

*Held:* That upon these facts the sale was fraudulent and void.

---

### FROM BEDFORD.

---

Appeal from Chancery Court of Bedford County. E. D. HANCOCK, Ch.

IVIE & IVIE, B. M. TILLMAN, and —— DAVIDSON, for Complainants.

BEARDEN & BATES, J. A. WARDER, and JOHN RUHM, for Respondents.

LURTON, J. These three causes have been heard together, as the evidence relied upon to establish the fraudulent character of the conveyance attacked is the same in each case. The complainants are creditors of the defendant, M. Frankel, and the several bills have been filed for the purpose of attacking as fraudulent and void a sale made by their debtor of a large stock of merchandise to his brother, the defendant, H. Frankel. The defendant, M. Frankel, was a merchant doing busi-

ness in Shelbyville, Tenn., under his own name, and conducting a similar business under the name of Isaac Frankel at Pulaski, Tenn. On the 2d of December, 1884, his indebtedness to persons other than the disputed debt of H. Frankel was about $35,000. On the 2d of December, 1884, the Shelbyville stock of goods was sold and transferred to H. Frankel upon an agreement, as stated in the answers of the defendants, that H. Frankel should take the stock "at the amount of the debts as they then existed, he to execute his notes in six, twelve, eighteen, and twenty-four months for the residue of the indebtedness over and above his own indebtedness, and these notes thus executed to be assigned in trust by Marcus Frankel for the benefit of his creditors, share and share alike." Under this arrangement the defendant, H. Frankel, executed his four notes payable to M. Frankel, each for $8,719.42, and payable respectively in six, twelve, eighteen, and twenty-four months after date. Simultaneously with this transaction, M. Frankel assigned these four notes to —— Brown as trustee, for the benefit of all his creditors equally. Complainants refused to accept the benefit of this assignment, and attack the transaction as fraudulent. Within a day or two the stock of goods at Pulaski was sold to the same brother upon an arrangement not definitely appearing, but stated to have been of a similar character. Was this sale of the Shelbyville stock fraudulent as to the creditors of M. Frankel?

This stock is clearly shown to have been worth, at the time of this sale, $50,000. In the sale the alleged debt of M. Frankel to the purchaser, H. Frankel, is paid—that is, the agreement of sale was that H. Frankel should take this stock at a sum equal to the whole indebtedness, including the debt claimed to be due to himself, and should execute his notes for a sum equal to the whole indebtedness, less only his own debt. What was the debt due really to H. Frankel? The fact that this was a transaction between two brothers, while not a badge of fraud, is one which naturally awakens suspicion; and while not in itself and by itself sufficient to justify a court in setting aside the transaction, yet it is a fact which undoubtedly gives greater weight to other circumstances, if any such shall appear, than might otherwise attach to them. Bump on Fraudulent Conveyances, 96; *Bumpas* v. *Dotson*, 7 Hum., 317.

It is a fact in itself sufficient to require fuller and more distinct proof of the fact of the indebtedness and of the fairness of the transaction than would otherwise be sufficient. The several answers of the defendants are very vague on the matter of this alleged debt. Vagueness and indefiniteness in an answer to a bill of this description is in itself another circumstance arousing suspicion. These brothers must have certain data by which this debt, if it ever in fact existed, could have been stated with detail and precision in their answers. In each of the three answers H. Frankel

is declared to have been the largest creditor. In the answer to the bill of J. M. Robinson & Co. the only statement as to the amount or character of this debt is as follows: "Respondent's debt of eighteen thousand dollars was due; he could have proceeded energetically to collect." In the answer to the bill of J. Herman the answer says that "respondent's debt of sixteen thousand dollars was due," etc., while in the answer to the bill of Herman, Loeb & Co. there is no amount stated, the allusion to the debt being "that respondent's debt was due; he could have proceeded energetically to collect." While this disagreement in these several answers as to the amount of this debt, and the entire failure to show in what this debt consisted and when and upon what consideration it was contracted, is not of itself enough to satisfy us of its fictitious character, yet it is an added circumstance to the already awakened suspicion.

The deposition of M. Frankel throws no light upon this question. He was not examined by his counsel upon the matter of this debt. H. Frankel, in his deposition taken upon interrogatories, states that his object in buying this stock "was to secure a large claim owing to me from my brother, Marcus Frankel; which I thought I could do by assuming his liabilities. This debt of my brother Marcus was principally for money loaned and *indorsements*, amounting in all from twenty-five thousand to thirty thousand dollars, all of which was

then owing to me from my brother and no part of which had then been paid."

Upon cross-examination concerning this debt he states that "M. Frankel was indebted to Frankel & Butler, of which firm I was a member, on account of indorsements to Levy Bros. & Co., to Stich Bros. & Co., and to the City National Bank of Denver, all of which has been paid by me. In addition to this he owed for money loaned by Frankel & Butler, and guaranteed by myself and Louis Butler, and to myself and Louis Butler, in a large amount, aggregating in all about $30,000. As to the amount to be allowed out of the purchase-price of each of said stores to said Frankel & Butler upon said debts due I do not now remember, but I refer to the bill of sale wherein the amounts so to be paid are correctly and distinctly set forth. As I now remember the said bill of sale, I gave, to the best of my recollection, for the Pulaski goods my note for $16,800."

This is as much light as Mr. H. Frankel proposes to give concerning the existence of this large claim. The bill of sale to which he refers us as showing how much he credited this expanding debt by reason of his purchase of the Pulaski stock, and how much by reason of his purchase of the Shelbyville stock, he does not file. As we understand his deposition, he took the Pulaski stock for $16,800; but whether the whole of this or what part of it was paid on this debt to himself, we cannot determine. The whole Pulaski transaction

is shrouded in darkness. The debt, stated in one answer to be $16,000 and in another at $18,000, has expanded, according to this deposition, to $25,000 or $30,000. No evidences as to a dollar of this debt are filed. No statement of the items is given. His counsel, however, seem to mainly rely upon the deposition of Mr. Wallace, the cashier of a bank at Shelbyville and a creditor, for proof to sustain the fact of this indebtedness. Mr. Wallace does prove that while M. Frankel was in business at Shelbyville he drew on H. Frankel for sums aggregating about $17,000, and that these drafts were passed to the credit of M. Frankel, and were paid by the drawee. Admitting that this is true, yet it by no means shows that M. Frankel was not drawing against his own funds, or that the claims had not been paid. This witness proves that H. Frankel had more than once said to him, about the time of this sale, that all that he had was the debt due to him by M. Frankel. An advance of loan of his whole estate by a brother living in Colorado to one living in Tennessee indicates something more than brotherly affection. The proof by itself is wholly insufficient to overcome the suspicion surrounding this claim.

Now, in view of the relationship between the parties to this transaction, and the grave suspicions which point strongly to the fictitious character of the debt, let us look at the other facts. This brother, H. Frankel, to whom this sale was made,

was a resident of the State of Colorado. He reached Shelbyville but a day or two before this transaction, and evidently came in company with one Leo Frank, an agent for H. B. Claflin & Co., large creditors of Marcus Frankel. A secret consultation was had, at which there were present the two brothers and their counsel, and Frank, the representative of Claflin & Co., and the representative of one of the local banks, which was a large creditor. The situation is pictured by the joint answer of the two brothers:

"Your respondent [M. Frankel] found himself confronted with the questions, 'What is the best to do for my creditors? What is the best mode to adopt to secure the most for them?' Animated with this purpose alone, his older brother and co-defendant was, with representatives of creditors and prominent business men, invited to a consultation. Respondent had no means with which to pay except as he could realize from the goods, and it was evident to all that, with the pressure of the times, the money could not be realized to meet the debts as they fell due. It was likewise apparent, and all believed, if a general assignment of the goods in trust was made under the continued stringency of the times, the innumerable expenses and the modes and methods that inevitably attend the closing out of such a stock of goods, but a comparatively small amount would be saved and realized for the creditors under these circumstances. The representative of another cred-

itor and the consulting attorneys proposed and advised that the only reasonable solution of the difficulty was a purchase of the stock of goods by Henry Frankel at the amount of the debts as they then existed."

Notes were to be given, as before stated, and these notes assigned by M. Frankel for the benefit of creditors. Though there were other creditors in the town at the time, they were not invited to this conference. The sale was made and the notes were turned over to a trustee. These notes were wholly unsecured. H. Frankel, the maker, had not a dollar of property in this State or any other save his claim of a debt against this brother. It is difficult to believe that any creditor would advise or sanction such a transaction who had not some secret trust declared in his favor. That such a secret arrangement was made in behalf of the two creditors present and advising this course is rendered very probable, for the proof shows that the debt to the bank was in a very short time paid off in full by H. Frankel, and that he at once gave his individual notes to the other creditor present, H. B. Claflin & Co. That this was understood at the time we have no manner of doubt, and it is just such a secret preference as might be expected. The great body of the creditors found themselves secured only by the notes of a non-resident of no financial responsibility, the collection of their debts postponed for six, twelve, eighteen, and twenty-four months, and

all the assets of their debtor turned over to an irresponsible brother, claiming a large and very suspicious debt.

A sale of this character cannot be permitted to stand. A sale by a failing debtor of all his property to an irresponsible purchaser, and upon so long and unusual a credit, with no security, is an unquestioned badge of fraud. It was not a sale safe for the debtor or the creditors, or calculated to be useful to either. Bump on Fraudulent Conveyances, 89, 92, and 93; *Hendricks* v. *Robinson*, 2 Johns. Ch. Rep., 300.

Even if H. Frankel be treated, as he well may be, as in effect a trustee of this stock of goods in behalf of the creditors whose debts he in effect assumed, yet in this case he would be a trustee without bond, clothed with the legal title and permitted apparently to buy and sell and continue the business at his pleasure.

In view of the facts of this case, we hold that a sale by a failing debtor of all his available assets to a near relation, upon consideration of the payment of a large and suspicious debt to himself and the execution of his unsecured notes, payable in six, twelve, eighteen, and twenty-four months, for a sum over and above his own debt and equal to all the other debts of the vendor in amount, the purchaser being a man of no financial responsibility, and having no reasonable means of paying such notes except from the assets so purchased, is fraudulent and void.

Robinson and others *v.* M. and H. Frankel.

The fact that it was a part of the agreement of sale that the notes of such purchaser should be turned over to a trustee for the benefit of the creditors of the vendor, and that such assignment was made, will not save the transaction. Creditors cannot be compelled to accept such a hazardous and unsafe security or have the collection of their debts postponed for so unreasonable a time, especially where the purchaser is a relative and claims a debt not satisfactorily proven.

The decree of the Chancellor will be affirmed.