ITEN BISCUIT CO. v. HAMILTON NAT. BANK et al.

Eastern Section.   March 25, 1933.

Petition for Certiorari denied by Supreme Court, June 24, 1933.

Noone & Ziegler, of Chattanooga, for appellants.

Cantrell, Meacham & Moon, Wilkerson & Wilkerson, and J. H. Anderson, all of Chattanooga, for appellees.

CASSELL, S. J. The original bill in this cause was filed April 28, 1930, by the Iten Biscuit Company for the use of the American Surety Company for $1,688.61 for complainant, or a total of $4,699.61, which amount at a later date was increased by amendment to approximately $5,000. The ground for recovery was predicated upon alleged misappropriations by one J. L. McLaughlin, the manager of the company at Chattanooga, and it is alleged that he conspired with defendant J. S. Allen, who at that time was one of the tellers for the defendant Hamilton National Bank, and both Allen and the bank are made parties defendant to the suit and recovery is sought against both of them.

Demurrers were filed by both defendants and overruled and the grounds relied on were later incorporated in the answers of each. The substance of the answers to the bill and the amendment hereto is that there was no conspiracy between McLaughlin and defendant Allen, who, it was alleged, was agent of the Hamilton National Bank, and, furthermore, that neither the bank nor Allen knew anything about any misappropriation of funds on the part of McLaughlin, and that, in absence of such information, it was denied that there was any responsibility on part of either of the defendants. In short, the answers deny that anything was done by either one of defendants which caused any loss on the part of the complainants. No evidence was introduced in the case to show that the American Surety Company lost anything so we will not consider it in this suit. The Chancellor filed a written statement of the facts and we have very carefully gone over the record, in addition to reading the briefs in the case, and have come to the conclusion that we can do no better than to adopt in the main the findings of the Chancellor on the facts as our findings in this case, especially since counsel for complainant in their statement of the case refer to and practically adopt a large portion of these findings in their brief. This opinion shows much research and later on we shall refer to the very intelligent discussion of the law given therein. The Chancellor held in favor of the defendants and an appeal to this court has been made and errors have been assigned.

We now quote liberally from the findings of the Chancellor below and make them our findings of the facts in the case:

"The Iten Biscuit Company, now a subsidiary of the National Biscuit Company, is a Delaware corporation engaged in the bakery business and maintains branches in various cities throughout the country for the sale of its products. In 1929, and for several years

prior thereto, it had a branch in Chattanooga which its agent J. M. McLaughlin was in charge of as manager. This branch did its banking business with the defendant Hamilton National Bank, where it kept its account. The defendant J. S. Allen was one of the tellers of the said bank. It was the custom of complainant to have its traveling auditors, at intervals, to check up and audit the accounts of its branch managers, and, on June 19, 1929, its auditors came to Chattanooga and made an audit of McLaughlin's accounts.

"By its original bill and its amended bill, the complainant charges that on the dates just mentioned McLaughlin was short in his account with complainant in the sum of $2,688.61 and that McLaughlin and the defendant Allen, one of the bank's tellers, entered into a conspiracy to conceal said shortage from complainant's auditors, which they succeeded in doing by a fraudulent manipulation of the complainant's account at the defendant bank. The result was, complainant alleges, that McLaughlin's account with it was passed by the auditors as correct, with the further result that McLaughlin was retained as manager of its Chattanooga branch and was thereby enabled to steal or embezzle and did steal or embezzle other moneys of complainant before his default was discovered. Complainant alleges that the total amount of McLaughlin's peculations, including the shortage of $2,688.61 that existed on June 19, 1929, was $4,996.86, for which it sues both Allen and the bank. McLaughlin was under bond to complainant for the faithful performance of his duties and the American Surety Company was surety upon said bond. Complainant alleges, but does not prove, that the American Surety Company paid it the sum of $3,000 on account of McLaughlin's shortage, and to the extent of this sum it filed its bill for the use of the American Surety Company. The latter company has not sued, and the complainant has showed no right to sue for its use. This, however, in the view of the case which I take, is not material and will not be further noticed. The bill will be taken as the bill of the Iten Biscuit Company.

"The defendants demurred separately to the original bill and again to the bill as amended. These demurrers were overruled with leave to rely upon them in the answers. They were relied upon in the answers and were duly brought up before the trial. Because I prefer to decide the case upon the facts proven, I overrule the demurrers pro forma without discussing their merits. As to the answers, it is sufficient to say that they make an issue as to the liability of the defendants or either of them.

"The following facts, in addition to those already stated, are undisputed:

"The Iten Biscuit Company established its branch in Chattanooga

some time in October, 1923. It carried its account from the beginning in the Hamilton National Bank. McLaughlin began to act as complainant's manager of its Chattanooga branch on or about June 4, 1926. The witness F. G. Frey, auditor for and called by complainant, describes McLaughlin's duties and authority as follows:

" 'Q. 45. Who had charge of the funds, deposits of the Iten Biscuit Company for the Chattanooga Branch? A. J. M. McLaughlin.

" 'Q. 46. What did Mr. McLaughlin's duties consist of? A. He was the manager of the local branch of the Iten Biscuit Company at Chattanooga, and signed all disbursements, that is, all checks. He collected all funds and deposited them to our account and conducted the business in general out of the Chattanooga Branch.

" 'Q. 47. You say that he disbursed the funds, what do you mean by disbursing the funds? A. Any disbursements in the way of salaries or any expense incurred at the Chattanooga Branch, he was the man who paid them.

" 'Q. 48. What was his duties with reference to customer's checks which he received? A. He accepted them, credited the account of the customer at the Agency, and deposited them in the Bank to our account.

" 'Q. 49. By our accounts, what account do you mean? A. The Iten Biscuit Company.' "

"The defendant Allen was one of several tellers of the defendant bank. He was twenty-six years of age at the time of the transactions in question. He came to the defendant bank in 1927. Before that, he had had some experience in banking as an employee of a small bank in Smithville, Tennessee. When he came to the Hamilton National Bank, he was first placed in what is called its clearing house. He was subsequently promoted to the position of teller. In that position he was put in charge of the cage lettered A to K. This means that any depositor of the bank whose name began with A to K, inclusive, was expected to go to the cage lettered A to K, inclusive, to make his deposit or cash his check. McLaughlin was the man who uniformily made the deposits for complainant. Since complainant's name began with the letter "I" he went ordinarily to Allen's cage, but not always; if Allen appeared to be busy, he went to another cage.

"On June 19, 1929, McLaughlin appeared at Allen's cage and offered for deposit to the credit of the Iten Biscuit Company a check drawn on itself for $2,668.61 and requested that this check should be held until the next day, when he would take it up. To this Allen agreed and laid the check aside in his drawer, but entered up a credit upon the account of the Iten Biscuit Company of $2,668.61, the amount of the check.

"McLaughlin did not take up the check on the following day nor until June 25, 1929. On this date he took up the check for $2,688.61 by depositing to the credit of the Iten Biscuit Company the following checks of its customers:

| Date | | No. | Amount |
|---|---|---|---|
| 6—22—29 | McCamey-Stone-Deakins Co. | 5 | $246.37 |
| 6—21—29 | Lay Hall Gro. Co. | 6 | 203.00 |
| 6—12—29 | D. C. Renner & Son | 8 | 34.72 |
| 6—21—29 | U. S. Wholesale Corp. | 23 | 41.98 |
| 6—21—29 | Roanoke Whol. Gro. Co. | 24 | 21.42 |
| 6—20—29 | Brenner Grocery Co. | 25 | 51.39 |
| 6—21—29 | Chas. J. Vance | 26 | 187.41 |

"—and in addition the check of the Iten Biscuit Company to itself for the sum of $1,901.82. This check, together with the aforesaid customers' checks, aggregated exactly the amount of the original check of $2,688.61.

"The original check for $2,688.61 was thus satisfied, but it left the check of the Iten Biscuit Company on itself for $1,906.82 yet to be satisfied. This check was renewed on July 2d, and was not finally paid until July 13th or 14th. In the meantime, McLaughlin deposited in the bank the following checks of its customers, to-wit:

| Date | Drawer | Date Cleared | Amount |
|---|---|---|---|
| June 19, 1929 | Sylacuga Gro. Co., Inc. | June 26, 1929 | $ 54.83 |
| June 24, 1929 | Calhoun Grocery Co. | June 29, 1929 | 132.29 |
| June 28, 1929 | B. S. Renner & Son | July 12, 1929 | 122.61 |
| June 28, 1929 | U. S. Wholesale Corp. | July 15, 1929 | 195.04 |
| July 1, 1929 | Calhoun Grocery Co. | July 15, 1929 | 79.70 |
| July 2, 1929 | Calhoun Grocery Co. | July 15, 1929 | 58.89 |
| July 2, 1929 | Sylacuga Gro. Co., Inc. | July 15, 1929 | 123.04 |
| July 5, 1929 | Charles J. Vance | July 29, 1929 | 155.67 |
| July 5, 1929 | Lay-Hall Grocery Co. | July 15, 1929 | 115.08 |
| July 5, 1929 | Simpson Grocery Co. | July 15, 1929 | 546.20 |
| July 9, 1929 | McCamey-Stone-Deakins Co. | July 12, 1929 | 193.02 |
| July 10, 1929 | Simpson Grocery Co. | July 15, 1929 | 200.05 |
| July 10, 1929 | U. S. Wholesale Corp. | July 15, 1929 | 162.05 |
| Aug. 29, 1929 | B. B. S. Grocery Co. | Sept. 9, 1929 | 23.61 |
| | Total | | $2162.07 |

"Allen applied all of these checks, except the first two and the last, to the satisfaction of the check for $1,951.35, which left a difference of $49.52, and this difference upon McLaughlin's demand, Allen paid over to him in cash. Allen also paid over to McLaughlin in cash the check for $21.63. What was done with the other two checks does not appear. But in the manner aforesaid the check for $1,902.82 was paid and complainant's account at the bank balanced.

"11. The foregoing facts are undisputed. To this statement must be added the fact, which is not conceded, to-wit, that in all of the aforesaid transactions with McLaughlin, Allen was innocent of any wrongful intent. That he was negligent, even that he was grossly negligent, must be conceded. But that there was any conspiracy between him and McLaughlin is not sustained by the proof. The bill

charges that these two were intimate friends. This is not shown. Allen lived at the foot of Cameron Hill on the west side of town, and McLaughlin lived east of Mission Ridge several miles away. It is true that Allen's wife became acquainted with a female member of McLaughlin's family in the course of their feminine activities and that at his wife's suggestion they called at McLaughlin's home on one occasion. McLaughlin never was in Allen's home. To show that Allen knew or ought to have known of McLaughlin's shortage, great weight is attached to the conversation between McLaughlin and him at the time the $2,688.61 check was deposited. On his direct examination Allen recounted said conversation as follows:

" 'Q. 92. Was anything said to you at any time by McLaughlin about an auditor coming to check him up? A. All that was said about an auditor was when he brought the check to me.

" 'Q. 93. What check? A. The check for $2,688.61, and after the transaction was made he talked a minute or two and casually asked me, saying "Jack Allen, when are you expecting the auditor?" and I said "I hardly know, I just don't know when they will be here" and as he started off he said "I expect they will come in and see me before long, I don't know, I expect to get some commission on sale I have made" or accounts he had collected or something to that effect.

" 'Q. 94. Did you know that the auditors of the Iten Biscuit Company were in Chattanooga? A. No, sir.

" 'Q. 95. He just told you that he was expecting them? A. Yes, sir.

" 'Q. 96. State whether or not the demeanor or manner of Mr. McLaughlin was anything unusual on that occasion when he brought in that check? A. No, not a bit in the world.

" 'Q. 97. Did you notice anything suspicious about his conduct when he brought any of the checks to you? A. No, sir.

" 'Q. 98. When did you find out that McLaughlin was short? A. When Mr. Mitchell came to the Bank and told Mr. Shadden and Mr. Shadden called me back to his desk.'

"On cross-examination he qualified this somewhat, but letting it stand for what it is worth without the later qualification, it does not, in my opinion, show knowledge or notice to Allen. To say that busy tellers receiving deposits should take cognizance of the casual remarks of a depositor and draw far-fetched conclusions therefrom is more than the law requires of tellers. The facts simply are that this twenty-six year old boy negligently and carelessly yielded to the request of McLaughlin to hold the check for $2,688.61 for a day and made the mistake of turning it in in the meantime for the credit of the Iten Biscuit Company."

Other facts not hereinbefore recited will be noticed below in the discussion of our conclusions in the matter.

The assignments of error filed in behalf of the Iten Biscuit Company, however, are entitled ''in the Supreme Court'' instead of ''the Court of Appeals.'' This evidently is a typographical error, no motion having been made by counsel for the appellees concerning it and inasmuch as defendants' counsel in their brief have treated the assignments of error as having been entitled in this court, we will treat them as part of the record in the cause and as having been properly filed herein. These assignments are as follows:

''First Error:

''The Court erred in failing to hold that the participation of Allen in the check transaction by which McLaughlin's shortage was perpetrated and concealed was with such guilty knowledge of the fraud as to render himself and the bank, his principal, liable therefor.

''Second Error:

''The Court erred in failing to hold that the bank in permitting the appropriation by McLaughlin to his own use of checks made payable to the Iten Biscuit Company and endorsed 'For Deposit Only' was liable for the amount of such checks thus misappropriated.

''Third Error:

''The Court erred in holding that the defalcation subsequent to the $2,688,61 check transaction was not the proximate result of Allen's negligence or activity, there being no evidence to support his finding on this point.''

As these assignments raise practically one question in the case, we will treat them as one question, that is, the liability of the defendants. First as to the theory of conspiracy charged by the complainant below, appellant here, we do not think there is anything in this contention. To constitute a conspiracy there must be a combination of two or more persons, as one person cannot conspire with himself, and there also must be a unity of design and purpose, for the common design is the essence of the conspiracy. 12 Corpus Juris, sections 542, 543. Then again, it must be shown that there was some damage inflicted or that damage naturally flowed out of the act of conspiracy. 12 Corpus Juris, sections 542, 543.

It is not shown in the record anywhere that this bank clerk, Allen, conspired with McLaughlin, the manager of the complainant company, to hide his shortage, nor is it even shown that he knew there was any shortage or would likely be a shortage. Then again, as stated by the Chancellor, neither of defendants could be liable for any shortage on McLaughlin's account that may have occurred before the check transaction of June 19th, neither is it charged anywhere in the bill that on June 19th McLaughlin had any assets out of which his shortage might have been made which property subsequently was

disposed of. As to the additional peculations or shortages of McLaughlin after that time for which liability is claimed because it is said that McLaughlin was allowed to retain his position, the Chancellor well states the three answers to this matter:

"1. The first is that complainant through its auditors was itself guilty of negligence. This in addition to the fact that McLaughlin was its own agent. As for its auditors, it is perfectly evident that their audit on June 19, '29 was merely perfunctory and that if they had examined McLaughlin's accounts on that date with half the care they examined his accounts after he burned complainant's branch office, they would have discovered his shortage. The deposit of the check for $2,688.61 and the resulting credit to the Iten Biscuit Company on its account in the defendant Bank was an extraordinary deposit. It was more than twice as much as the Chattanooga Branch had ever deposited before, and was made on the very day the auditors arrived in Chattanooga. Complainant would require this twenty-six year old teller, whose duty was to be agreeable to the Bank's customers, to be more diligent to challenge and scrutinize McLaughlin's deposits than its auditors were, whose duty was to do this very thing. The auditor Frey admits that on his June audit he did not suspect McLaughlin of any shortage; neither did Allen. The proof shows that Frey admitted that he ought to have discovered the shortage on his examination on June 19th, and he does not deny making this admission. I agree with him. He ought to have discovered it.

"2. The subsequent loss, if there was any, was not the proximate result of Allen's negligence, and negligence is all that Allen was guilty of. To make Allen or the Bank liable for negligence it would have to appear (1) that Allen knew or ought to have known of McLaughlin's previous defalcation. He did not know of it and had no reason to suspect it; (2) that the credit for the $2,688.61 check would conceal McLaughlin's defalcation from complainant's auditors. Apparently it did, but it ought not to; (3) that McLaughlin would be continued in the employ of complainant, and (4) that he would not steal other moneys of complainant. This in my opinion is too remote in the chain of causation.

"4. But finally and conclusively the evidence fails to show that there was any further defalcation. After McLaughlin set fire to the branch office, complainant's auditors took the burned records and undertook to 'build up,' to use Frey's expression, McLaughlin's ledger account, starting from an 'assumed balance.' What this assumed balance was is not shown but on the basis of it the auditors reached the conclusion that McLaughlin was in default $4,996.86. Then assuming that the amount of his shortage on June 19th was $2,688.61 represented by said check, they drew the conclusion that he misap-

propriated some $2,000 after that date. How unreliable, under the circumstances, is their conclusion is shown by Frey's admission that his finding is 'far from final' and Mitchell in a second deposition admits he made an error of $1,174. But it is evident that they reach the sum of $4,996.86 by treating all the customers' checks hereinbefore referred to as having been misappropriated by McLaughlin. That is not true. The claim is based upon the rubber stamp indorsement which appears upon each of the checks and which reads as follows: 'Pay to the order of the Hamilton National Bank for deposit only, Iten Biscuit Co.' Much is made of the words 'for deposit only,' which, it is correctly said, constituted a special indorsement. But these checks were deposited in the Hamilton National Bank and went to the credit of complainant. The bank, through its teller, simply used the credit to extinguish the credit of $2,688.61 to which complainant concededly was not entitled. The outstanding and controlling fact on this branch of the case is the fact that complainant got the full benefit of every dollar of these checks, unless it be the two small payments made directly to McLaughlin. Whether McLaughlin used these payments for the benefit of complainant or not does not appear.

"Complainant's witness Frey produced five checks payable to complainant, as follows:

| Date | Payor | . | Date Cleared | Amount |
|---|---|---|---|---|
| 2/4/29 | D S Renner & Son | | 2/6/29 | $143.79 |
| 2/4/29 | Simpson Grocery Co. | | 3/7/29 | 521.42 |
| 4/18/29 | U S Wholesale Corp. | | 4/22/29 | 130.25 |
| 5/16/29 | D S Renner & Son | | 5/20/29 | 24.02 |
| 5/17/29 | U S Wholesale Corp. | | 5/21/29 | 95.18 |
| | | | Total | $914.66 |

"These checks were indorsed 'for deposit only' except that of the Simpson Grocery Company, which was indorsed in pencil, 'For credit to the Iten Biscuit Co.' None of them were set out in the bill. Because complainant's auditors say that in the mutilated records in the branch office they cannot find where complainant got credit for these checks and because Allen admitted cashing the check for $23.61 in July, we are asked to infer that the bank paid the cash on these checks directly to McLaughlin and the proceeds misappropriated by him. The inference is not warranted.

"Besides, if the bank did cash these checks for McLaughlin, that fact would not make the bank liable. McLaughlin appeared to be in full and complete control and management of complainant's Chattanooga branch and business with the powers of a general agent. Frey has filed a copy of the five pages of instructions issued by the complainant to its branch managers and rule 64 is especially relied upon. Neither the bank nor Allen had any knowledge or notice of any limitation upon McLaughlin's authority."

If it were shown that the bank or the defendant Allen profited by the transactions in question, everything else being out of the way, we would not hesitate to find the law as contended by the complainant applicable to the case at bar, however, as stated by the Chancellor, such is not the fact here.

The evidence shows that the Iten Biscuit Company was given credit for all the checks in question and that none of them were cashed in the sense that Allen turned over the proceeds to McLaughlin except for two small checks and these were turned over at the demand of the manager of complainant's company.

From the facts in this case we do not believe that defendant Allen's mistake was anything more than negligence nor do we believe that the bank or Allen knowingly united with McLaughlin in a misappropriation of the funds in question. If such were true and everything else being out of the way, there would be liability under the case of United States Fidelity & Guaranty Co. v. People's Bank, 127 Tenn., 720, 725, 157 S. W., 414. In the absence, however, of evidence going to show this, we are constrained to affirm the opinion of the Chancellor and his decree is affirmed with costs.

Portrum and Thompson, JJ., concur.