**John D. HUX, Receiver of the Federal Grain Company, Inc.**

v.

**Sydney BUTLER (Mrs. L. V. Butler).**

**Civ. A. No. 4367.**

United States District Court
W. D. Tennessee, W. D.

April 12, 1963.

On Motion for New Trial
July 9, 1963.

James E. Reeves, Caruthersville, Mo., for plaintiff.

Lucius E. Burch, Jr., Wade H. Sides, Jr., Memphis, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

John D. Hux, Receiver of the Federal Grain Company, Inc., filed an action

against Mrs. Sydney Butler to recover sums of money claimed to have been improperly withdrawn from Federal and paid to her under the directions of her husband, L. V. "Jimmie" Butler.

The case was tried to the Court and lasted for four days and some 800 or 900 pages of testimony were taken and 113 exhibits filed. At the conclusion of the oral argument, the attorneys were given time in which to file additional briefs. The briefs have been filed and the case is ready for decision on the merits.

We shall borrow freely from plaintiff's trial brief in explaining the relationship of the parties and the history of what proved to be a short and turbulent life of Federal Grain Company, which ended in a receivership in the United States District Court for the Eastern District of Missouri, Southeastern Division upon the complaint of the Government. It was federally licensed under the provisions of the National Warehouse Licensing Act and a considerable amount of grain owned by the Government and its agency, Commodity Credit Corporation, was stored in its elevators. In the fall of 1960, it issued checks to various farmers in payment of grain purchased from them which were dishonored by drawee banks due to insufficient funds. Efforts of these farmers to obtain their money precipitated the receivership.

Federal owned five grain elevators, four located in southeast Missouri and one in Olive Branch, Illinois. The elevators were formerly owned by Foster-Butler Company in which Mr. L. V. Butler, who was referred to by the witnesses throughout the trial as "Jimmie", owned a financial interest and were sold by his trustee in bankruptcy to Joel Montgomery, who in turn sold them to Leonard M. Bernes and V. C. Rasmussen in May, 1959. Bernes and Rasmussen paid $550,000.00 for the elevators and certain equipment, $10,000.00 of which was paid in cash and the balance secured by first and second deeds of trust. Federal Grain Company was then chartered as a corporation by the State of Georgia and the elevators and equipment were transferred[1] to it in consideration of the issuance of common stock.

Butler was employed by Bernes and Rasmussen as a grain consultant to Federal with authority to buy and sell grain for the account of Federal. His authority to speculate in the grain futures market was a controversial issue. Rasmussen stated that he was given authority to speculate in the grain market, but Bernes stated that he was not. However, Bernes stated that he found out that he was speculating in his wife's name for Federal some time in June, 1960, and ordered a discontinuance of the practice. Butler owned no stock of Federal but had an option from Bernes and Rasmussen to become one-third owner of the stock upon the payment of a pro rata share of the advancements and outlays made by Bernes and Rasmussen to the corporation.

Bernes and Rasmussen were residents of Atlanta, the former being a CPA and the latter a businessman. The entire stock of the corporation was owned equally by them subject to Butler's option. Rasmussen sold his interest in the corporation in June, 1960. This stock was then held by the corporation subject to the option of Butler to purchase 50% interest under certain conditions, which included the payment of one-half of all advancements by Bernes to the corporation. At that time, Bernes had advanced about $65,000.00 and Rasmussen around $20,000.00, although the parties agreed in the beginning to make advancements upon an equal basis. The sale by Rasmussen made Bernes the sole stockholder.

Neither Bernes nor Rasmussen actively participated in the management and operation of Federal. T. E. Thompson of Morley, Missouri, who had formerly been employed by Butler when he owned an interest in the same elevators as Foster-Butler, was elected President, although he owned no stock. Butler was the dominant, if not the sole figure in the management and operation of the business. Thompson appeared to follow the instructions of Butler in toto except when **he**

found out that the corporation was in serious trouble and Butler asked him to remove some of the Government wheat from the elevators which he refused to do.

Federal was organized in January, 1960 and subsequent to this date Butler organized Best Gin and Land Company, a Missouri corporation, whose place of business was located in the general vicinity of the Missouri elevators of Federal. This corporation was operated and controlled by Butler. One share of the stock was issued to T. E. Thompson, one to Samuel Wyatt and 998 to J. J. Beatley, who was Butler's accountant. On February 20, 1960, Beatley surrendered his shares and 449 shares were issued to Samuel Wyatt and 99 shares to T. E. Thompson and 499 shares to the Reynolds Cotton Company. On July 14, 1960, Wyatt sold his stock back to the company and surrendered the certificate. From that date, the Reynolds Cotton Company was the controlling shareholder.

Reynolds was chartered by the State of Tennessee on April 10, 1959. Butler is its President, Mrs. Butler its Secretary-Treasurer and Beatley one of its Directors. All of the outstanding stock is owned by Mrs. Butler as trustee for the minor children born of the marriage of her husband and herself.

The Receiver recovered judgment against Best Gin and Land Company for conversion in the amount of $141,700.35 on December 7, 1961, which is unsatisfied. The conversion consisted primarily of 75,000 bushels of soybeans transferred at the direction of Butler from the elevators of Federal during the period from October 2, 1960 to November 14, 1960 which were loaded on railroad cars by Best at McMullin, Missouri and shipped and sold principally to B. C. Christopher and Company and P. R. Markley Company. At the direction of Butler, Best drew the drafts on the purchasers of these beans, with railroad bill of lading attached, and collected the proceeds of the drafts. Other items of conversion included in the judgment were corn and checks. The initial capital of Best was $500.00. It became defunct and went out of business about the same time Federal went into receivership.

The Henning Grain Company, a proprietorship operated by Butler, was located at Henning, Tennessee. Its property is held in trust by trustees subject to the orders and directions of Butler.

The plaintiff seeks to recover the sum of $21,833.64 under Count I of the complaint. This amount is represented by six checks, one dated May 9, 1960 for $2,000.00, another May 14, 1960 for $6,006.00, another May 27, 1960 for $4,004.00, another June 21, 1960 for $1,401.40, another June 28, 1960 for $2,000.00 and another September 28, 1960 for $6,422.25. It is claimed that these checks represented money that belonged to Federal but were delivered to Francis I. DuPont and Company and Mitchell-Hutchins Company and credited to Mrs. Butler's margin account. $10,422.25 of this amount was paid to DuPont and represented by three Federal checks, Exhibits 37, 38 and 39, and the balance of $11,411.40 was transferred to Mrs. Butler's commodity trading account at Mitchell-Hutchins, through the use of three Federal checks that were used to purchase bank drafts. The three checks were all drawn by Federal and payable to the order of Oran State Bank, Oran, Missouri, and were filed as Exhibits 61, 62 and 63.

The Receiver concedes that Mrs. Butler is entitled to a credit of $7,500.00 against the money that was transferred to DuPont as he has recovered that sum from DuPont since the institution of the present action.

With commendable frankness, the attorney for the Receiver states in his supplemental brief that he probably is not entitled to recover anything on the DuPont transaction because of the testimony of Bernes that he found out that Federal had traded at DuPont in Mrs. Butler's name and he told the accountants of Federal to pay off the debt and to dis-

continue the practice. But he insists that Mitchell-Hutchins' margin account is in a different situation as Bernes did not testify that he authorized these transactions in Mrs. Butler's name. Two of these checks representing the balance due Mitchell-Hutchins were drawn in May, 1960 and the third on June 21, 1960. Rasmussen testified that he authorized Mr. Butler to trade on futures in the grain market for Federal in the name of Mrs. Butler at Mitchell-Hutchins. The first two of these checks were written while Rasmussen was with the Company, but the third was written about 21 days after he severed his connections with the Company.

The Receiver points out that Exhibit 61, a check from Federal to Oran State Bank in the amount of $6,006.00 and Exhibit 62, another check of Federal to the Oran State Bank in the amount of $4,-004.00 were not charged as advancements to Mrs. Butler in the journals of Federal, but were shown as advances and therefore, Bernes didn't know about them and couldn't find out about them from the books of Federal.

The Receiver concedes that against the sum of $11,411.40 advanced to Mitchell-Hutchins, Mrs. Butler is entitled to a credit of $4,578.00 which represents a Mitchell-Hutchins' check which she endorsed and which was paid to Federal and filed as Exhibit 16. Thus, after allowing all credits, the Receiver claims there is a balance due of $6,833.40 that represents Mitchell-Hutchins margin payments and which he claims that he is entitled to recover.

It was necessary for him to concede that Mrs. Butler showed a loss from all her commodity transactions during this period, but it is argued that this is no defense to the claims in either of the three counts of the amended complaint. It is asserted that she received the money and allowed it to be spent in unprofitable market speculations and this makes her legally responsible. That she was unjustly enriched when the money was used to pay on her margin account and the fact that she lost in the tradings on the market does not excuse her from liability. This argument does not take into consideration the fact that she did not know that her husband was speculating in the grain market for Federal in her name. That the accounts were operated for the benefit of Federal which received profit checks from these accounts, which checks passed through her hands and were turned over to Federal.

If Federal, with knowledge, accepted profit checks derived from Jimmie Butler's speculation in the grain market even though he acted without authority, this could amount to ratification. Whitfield v. May, 19 Tenn.App. 431, 89 S.W.2d 764; Dayton Bread Co. v. Montana Flour Mills, 126 F.2d 257, 262 (C.A. 6).

If Mrs. Butler had gained by the speculations, the law would supply a contract that would make her liable for such gains. Since she did not gain and did not participate in the fraud charged against her husband, she is not liable in any amount under Count I.

■ Plaintiff seeks to recover $35,-350.00 under Count II which represents transfers from Federal through either Best, Henning or Reynolds. This item is made up of withdrawals from Federal Grain moneys without consideration to Federal and ultimately transferred to Mrs. Butler. All of the checks that were deposited in her account were payable to her with the exception of two checks of Henning in the amount of $500.00, Exhibit 73, and $1,050.00, Exhibit 74. Both checks were payable to Mr. Butler and endorsed by him and then endorsed by Mrs. Butler and deposited to her account. Three additional checks of Henning, Exhibits 70, 71 and 72 and four of Reynolds, Exhibits 85, 86, 87 and 88 represent ultimate transfers to her. The remaining checks involved in this Count are set forth in Exhibit 1.

The theory of this Count is that Mrs. Butler conspired with her husband to cause the moneys of Federal Grain Company to be diverted to her personal use. It is argued that Mr. Butler was to divert the money from Federal and channel it

either through Henning, Best or Reynolds, one or more, into the bank account of Mrs. Butler for her personal use.

It is claimed that Mrs. Butler acted in concert with her husband to accomplish the objects of the conspiracy, namely, the diversion of funds from Federal for her personal use.

■■ A conspiracy is a combination between two or more persons to accomplish an unlawful act, or a lawful act by unlawful means. Necessary elements are common design and concert of action. Brumley v. Chattanooga Speedway & Motordrome Co., 138 Tenn. 534, 538, 198 S.W. 775; Saier v. State Bar of Michigan, 293 F.2d 756, 761 (C.A. 6 1961).

In the Brumley case, the Supreme Court of Tennessee, speaking through the late Justice Samuel C. Williams, said at page 538 of 138 Tenn., at page 776 of 198 S.W.:

"A 'conspiracy to defraud' on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose. (Citing cases). The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." (Citing cases.)

Counsel for the Receiver in his final argument stated, in effect, that he could not contend, in view of the proof, that Mrs. Butler was guilty of conscious wrongdoing. This Court is in accord with this concession.

The proof failed to show that she acted in concert with her husband to defraud Federal or that she had any intent to defraud any company. Not one of the officers or stockholders of Federal stated that they dealt with her in connection with any business respecting the company. The most that the representatives of the Memphis brokerage firm stated about her connection with its companies was that a trading account was carried in her name in which extensive trading in soybeans, corn and cottonseed oil were carried on. The trading was handled exclusively by her husband. She signed customers agreements with them in which she listed herself as a housewife, except in the agreement with Mitchell-Hutchins dated April 3, 1959 in which she listed herself as being employed by Reynolds Cotton Company, as well as housewife. The record showed that she was named as Secretary and Treasurer of that company, but does not indicate that she was active in that capacity or that she had anything to do with either that company, Best or Henning. She signed a letter to Mitchell-Hutchins dated April 3, 1959 authorizing that company to transfer $1,500.00 to her commodity account and that in consideration of a loan, agreeing that the money would only be used in her commodity account and that no money would be withdrawn from her grain account until the debit balance in her commodity loan account was paid in full. She also signed a letter to that company authorizing the transfer of funds segregated in customers commodity account. She wrote a check to Mitchell-Hutchins for $21,556.00. A letter from Mitchell-Hutchins dated April 1, 1960 stated that it had at the request of Mrs. Butler purchased 25,000 bushels of July soybeans futures in Chicago. Checks for $1,000.00 dated December 12, 1960 and for $6,000.00 dated January 3, 1961 were given by Mrs. Butler to Mitchell-Hutchins, the first of which states that it was given to balance her accounts. The ledger sheet of DuPont lists her address as DuPont Building, 22 South Second Street, Memphis, Tennessee. This address appears to have been the address of the Reynolds Company. She appointed her husband as her attorney in fact to trade in securities with privilege to withdraw money in securities in letter addressed to DuPont and Company. She signed a customers agreement with that company in 1959. She wrote a letter to DuPont on November 12, 1959 in which she stated that any transactions in soy-

beans will be in the nature of hedges unless otherwise notified.

None of these things indicate that she joined with her husband in a common purpose to defraud Federal or that she acted in concert with him toward that end. Nor can it be inferred that she acted with her husband with an intent to defraud Federal.

■ It is not essential that each conspirator have knowledge of the details of the conspiracy, but a common purpose is essential and that each has the understanding that the other has the purpose and such purpose must be supported by concerted action.

In Dale v. Thomas H. Temple Company, 186 Tenn. 69, 208 S.W.2d 344, the Potter group was held liable because they knowingly participated in the unlawful diversions of funds from the corporation and thus found guilty of an intentional participation in the fraud.

■ Negligence, or even gross negligence, upon the part of the party charged is not sufficient to make him a co-conspirator—wrongful intent is necessary. Iten Biscuit Co. v. Hamilton National Bank, 16 Tenn.App. 655, 661, 65 S.W.2d 615.

True, the party relying upon a conspiracy as a basis for a cause of action is forced to rely upon circumstantial evidence. Maggiore v. Bradford, 310 F.2d 519 (C.A. 6); Connolly v. Gishwiller, 162 F.2d 428 (C.A. 7). This is because wrongdoers do not ordinarily take with them witnesses to their wrongful acts.

■ Conspiracy in the criminal branch of the law has been defined as a partnership in crime. It is not necessary to prove preliminary meetings of the co-conspirators or formal agreements entered into to injure a party. It is sufficient to show common design and concert of action in the commission of unlawful acts or such facts and circumstances from which it may be inferred that overt acts were in furtherance of a common design. Calcutt v. Gerig, 271 F. 220 (C.A. 6).

In the Calcutt case, the conspirators incited a mob to destroy plaintiff's property and the Court held that they were liable for the acts of destruction done by the mob after the conspirators left the scene.

■ A conspirator is liable for all the damages caused by a co-conspirator in furtherance of the conspiracy although he does not participate in all of the acts and does not know the full scope of the conspiracy. Jezewski v. United States, 13 F.2d 599 (C.A. 6); United States v. Valenti, 134 F.2d 362 (C.A. 2).

■ An advance agreement as to other details of the conspiracy is not necessary to hold a person liable as a co-conspirator. Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561.

Plaintiff states that a large number of transfers of the funds of Federal followed the same general pattern and that all of such transfers were brought about by Mrs. Butler's husband; that she knew that he was insolvent and couldn't transact business in his own name; that she signed trading agreements authorizing him to speculate in her name; that she co-signed option agreements with him to acquire one-half interest in Federal; that any time he wanted money out of her account he could obtain it; that she endorsed and deposited the checks to her personal bank account; that she claimed approximately $90,000.00 in trading losses on her income tax return for her own benefit or for the benefit of Best, Reynolds or Henning; and that these companies were in fact the alter egos of her husband and that only $9,000.00 of these losses was shown for the benefit of Federal, which is the Mitchell-Hutchins transaction sued for in Count I.

It is said that the pattern shown by these transactions was to divert the money from Federal, run the checks through the account of one or more of the insolvent companies owned and controlled by Butler, then to his wife's account; that his wife would then personally endorse the checks and issue her personal check drawn by her against these deposits for

use and speculation in the futures market; that Mrs. Butler was the vital and essential tool and link in the conspiracy and without her participation the scheme could not have worked; that whatever she had to sign in order to facilitate the scheme she signed.

It is fervently argued that the foregoing circumstances show that Mrs. Butler was a co-conspirator in the fraudulent diversion of the assets of Federal. We do not agree. As previously indicated, if Mrs. Butler had profited by any of the transactions that were carried on in her name or if she had knowingly been a party to any wrongful diversions of Federal, the result would be different. She cannot be held for her husband's wrongs unless she knowingly participated in them. As previously indicated, plaintiff concedes that the proof fails to show that she was guilty of conscious wrongdoing. Since she did not profit from the transactions in Count II and did not knowingly participate in the alleged wrongful diversions and thus was not a party to the fraud, she is not liable under Count II.

Count III is based on the theory that Federal, as judgment creditor of Best, is entitled to have the transfers to Mrs. Butler in the amount of $48,756.00 set aside as being a fraud upon the rights of Federal as creditor of Best Gin and Land Company. Substantially all of the cash received by Best during the critical period came from Federal and these transfers are the subject matter of the judgment in the conversion against Best. Plaintiff states that to this extent Count III is the same as Count II in that the source of the money transferred to Mrs. Butler was from the Federal Grain Company. But, in order to avoid the necessity of tracing the funds, and because Best had other sources of income in the form of grain purchased from farmers which it later resold, Count III is filed on the theory of a judgment creditor seeking to set aside transfers in fraud of its rights.

It is claimed that the transfers to Mrs. Butler were without consideration and as such were void as to Federal as an existing creditor. Mrs. Butler's transferor in each transaction referred to in Counts II and III was a company owned or managed by her husband and the checks representing the transfers were delivered by her husband as either owner or agent of the transferor. The insolvency of the transferors was stipulated. The proof is silent as to whether the transfers were made by Henning, Reynolds, or Best in order to defraud their creditors. The proof was not sufficient to show that Mrs. Butler knew of any fraudulent design on the part of the transferor. The proof shows that the transfers were not gifts as she disbursed them in payment of obligations of Federal, and that she disbursed more money than she received and incurred a loss of $11,481.75, Exhibit 113.

The extension of her personal credit was a benefit to Federal and a prejudice to her. Either would be consideration for the transfers. 17 C.J.S. Contracts § 74, p. 425 et seq.

We have heretofore held that Mrs. Butler was not a party to any fraudulent transfer.

Fraud may not be inferred solely on the basis of the relationship of husband and wife although their transactions are carefully scrutinized when attacked for fraud. Union Bank v. Chaffin, 24 Tenn.App. 528, 534, 147 S.W.2d 414; Detrio v. Boylan, 190 F.2d 40, 42–43 (C.A. 5); Sieb's Hatcheries, Inc. v. Lindley, D.C., 111 F.Supp. 705.

Relationship of the parties is not a badge of fraud. Bumpas v. Dotson, 26 Tenn. 310; Sporrer v. Eifler, 48 Tenn. 633; Robinson v. Frankel, 85 Tenn. 475, 3 S.W. 652.

Plaintiff had the burden to show that the transfers of the items in Count III were made to put the assets beyond the reach of transferor creditors and that the transferee either knew of the fraudulent design or was a voluntary transferee. T.C.A. § 64–301 et seq.; 37 C.J.S. Fraudulent Conveyances § 7.

As indicated, insolvency was stipulated. The proof fails to show that Mrs.

Butler knew of transferor's alleged fraudulent design or that she was a voluntary transferee—meaning a transferee without consideration. On the other hand, the proof affirmatively shows that there was consideration for each transfer.

Regrettable as it may be that the farmers of Missouri and Illinois, as well as Bernes, will suffer losses because of the reckless operations of Jimmie Butler as shown in this record, the law does not hold his wife accountable for his wrongs unless the proof shows that she knowingly participated in them.

In summary, the Court holds:

(1) That Mrs. Butler was not unjustly enriched and did not knowingly participate in any wrong of her husband;

(2) That she was not a co-conspirator and not knowingly a party to the wrongful conversion upon the part of her husband; and,

(3) That she was not a voluntary or fraudulent transferee.

Counsel are commended for the thoroughness in preparation and excellence in presentation of their theories.

Counsel will present order in conformity with the views herein expressed.

On Motion for New Trial.

The plaintiff in this cause has filed a motion for a new trial and a motion to open the judgment and to amend findings of fact and conclusions of law.

A number of the matters referred to in plaintiff's brief in support of these motions were considered by the Court in its memorandum opinion after the original hearing, and, as counsel were advised at the hearing on these motions, it has not been persuaded that it was in error on those matters except the findings are amended to show that the Federal Grain Company, Inc. stock was held in its treasury with the right of Mr. and Mrs. Butler to purchase a 50% interest therein subject to certain conditions.

However, the Court does wish to deal briefly with certain other contentions. On page 8 of plaintiff's brief, the statement is made that Mrs. Butler denied all knowledge of the source of the monies which were involved with the extension of personal credit on behalf of Federal with respect to the transfers in Counts II and III. This is followed in the brief by the assertion: "However, on her Federal Income Tax Return she claims these monies for the benefit of herself and her husband's insolvent companies, and not for the benefit of Federal Grain Company."

The Court has carefully re-reviewed the relevant testimony of J. J. Beatley, the certified public accountant who prepared Mrs. Butler's income tax return for the year 1961. On the return which was prepared on information supplied by Mr. Butler some $85,000.00 in losses were reported on account of Federal Grain Company. They were not claimed or reported as personal losses, but were included in explanation of her trading account. There *was* reported as a loss some $9,000.00 which was paid out of her own funds in connection with the Federal Grain Company trading transactions. In the opinion of the Court, the testimony of Beatly sustains rather than contradicts its original conclusion that Mrs. Butler did not participate in a fraud with respect to the Federal Grain Company monies.

A second matter urged upon the Court at the hearing on the motions was that Mrs. Butler was liable on the theory that she was a constructive trustee of the Federal Grain Company monies. Without referring to them seriatim the Court is of the opinion that the cases cited by the plaintiff on this question are beside the point. In each of them, the constructive trust arose because the party involved ended up with funds of others, or their equivalent, which did not belong to him. In other words, there was actual unjust enrichment of the party sought to be held. In our case, Mrs. Butler did not end up with any monies of the Federal Grain Company, but in fact paid out or obligated herself to pay out in excess of $9,000.00 of her own funds because of the trading transactions. It is prob-

ably true that naked legal title to the funds derived from Federal Grain Company in the amount of approximately $85,000.00 vested briefly in Mrs. Butler. But as the Court indicated in its original opinion, although her account was used in the trading transactions she did not know what was going on—and plaintiff has advanced no argument at the hearing that she was enriched unjustly or otherwise because of the use of her trading account. In fact, the argument made at the hearing and the resulting re-examination of this portion of the record by the Court has served to reassure it of the correctness of its original decision as to Mrs. Butler's liability.

■ Finally, reference is made to the argument of plaintiff that the whole transaction was a gambling one which is made illegal by the Tennessee statutes and that therefore Mrs. Butler must be liable for the Grain Company losses. Because of its surface plausibility this contention and the authorities cited have been examined with particular care. There is certainly persuasive evidence in the record that these were gambling transactions and hence illegal under the Tennessee law. But where does such a conclusion lead? Assuming without deciding that these were sham sales of commodities and hence illegal, the Court is unable to see how that fact alone serves to involve Mrs. Butler more deeply than under the basic contention—upon which the Court has found negatively—that she was a co-conspirator with her husband to defraud Federal Grain.

Counsel for the plaintiff has well noted that 39 T.C.A. 2028 was addressed to the transaction between the broker and customer and was designed to prevent the customer from later suing the broker to recover losses on the commodity market. He concludes with the argument: "Applying the foregoing principles [which establish that these were gambling transactions] * * *, we respectfully submit that Mrs. Butler was engaged in the rankest form of speculation and gambling declared illegal under the law of Tennes-

see and therefore it cannot be considered as a consideration for transfers to her."

The Court is baffled by this argument. It has concluded that Mrs. Butler was not unjustly enriched and that she did not conspire with her husband to deprive the creditors of Federal Grain. Water cannot rise higher than its source. If Mrs. Butler was not unjustly enriched, and did not conspire or participate wittingly with her husband to deprive these creditors, the fact that what he did may have violated the statutes against gambling in commodities cannot affect her.

It is the opinion of the Court that the motion for a new trial must be denied and the motion to amend findings must also be denied, except the finding that Federal Grain Company, Inc. stock was held in its treasury subject to the option of Mr. and Mrs. Butler to purchase a 50% interest therein under certain conditions, which is granted.