**Robert P. KOEHLER et al.**

v.

**Thomas L. CUMMINGS, Jr., et al.**

**Civ. A. No. 4525.**

United States District Court,
M. D. Tennessee,
Nashville Division.

June 11, 1971.

As Amended July 22, 1974.

See also, 6 Cir., 495 F.2d 1373.

---

Herbert R. Rich, Philip M. Carden, Nashville, Tenn., for plaintiffs.

William R. Willis Jr., Nashville, Tenn., Charles S. Edwards, Syracuse, N.Y., for defendants.

Herbert Jamul, pro se.

## MEMORANDUM

MORTON, District Judge.

This is an action in two counts: one alleging conspiracy to deprive the plaintiffs of their property and property rights, and the second alleging the inducement of a key employee to breach his employment contract with plaintiff S.O.S. International. Plaintiff Robert P. Koehler is now president and majority shareholder of S.O.S. International. The suit was authorized on behalf of plaintiff S.O.S. International, Inc. by its Board of Directors. Suit is also brought by Sentry Products Corporation.

This is a suit based on diversity jurisdiction. Plaintiff Robert P. Koehler is a citizen of Florida. Plaintiffs S.O.S. International, Inc. (hereinafter referred to as S.O.S.) and Sentry Products Corporation (hereinafter referred to as Sentry), are corporations incorporated under the laws of Florida with their principal places of business in Florida. Defendants Thomas L. Cummings, Jr., Newburn K. Hayes, and George T. Roberts are citizens of Tennessee. Defendants George Thomas and E. L. Schneider

are citizens of New York. Defendant Herbert Jamul was a citizen of Tennessee at the time the suit was filed, and now is a citizen of Connecticut. Defendants Cummings & Co., Inc. and Jamul Safety Products, Inc. are corporations incorporated under the laws of Tennessee with their principal places of business in Tennessee.

Plaintiff Robert P. Koehler and defendant George Thomas first met Herbert Jamul, the employee whose services are the subject matter of this suit, in late July, 1963. Jamul approached them to obtain capital in the amount of $2,000 to develop safety garments and products made from a combination of reflective, phosphorescent and fluorescent materials. The individual materials were not new, but the idea of applying the reflective to the fluorescent materials (producing high visibility day or night) was novel. About August, 1963, plaintiff Koehler and defendants Thomas and Jamul, along with others not parties to this lawsuit, made plans to form a corporation, S.O.S. The purpose of the corporation was to develop and exploit the ideas and abilities of the defendant, Herbert Jamul. On August 20, 1963, the corporation papers, including a shareholders' agreement and an employment agreement with Jamul, were drawn up by Richard Hunt, a Miami attorney. A loan of $5,000, secured by shares of S.O.S. stock pledged by Jamul, was made by Koehler, Thomas, and Streeter, shareholders of S.O.S. The employment agreement between S.O.S. and Jamul, effective August 30, 1963, was to expire August 30, 1965. One of its covenants is germane:

> "7. For a period of two (2) years after the EMPLOYEE ceases to be employed by the EMPLOYER, the EMPLOYEE will not enter the employ of, or become an associate, partner, advisor or other agent, or shareholder, of any firm, association, corporation, or any other organization which manufactures or sells, as agent or principal, within any of the states listed below, the same fabricated reflective safety items (including but not limited to vests, gloves, and other garments, as well as flags, banners, and advertising displays) produced or sold by the EMPLOYER: [A list of 31 states, including the District of Columbia and Tennessee, follows.]" Employment Agreement, Plaintiffs' Exhibit 2, pp. 2–3.

An office and small plant was established at Hialeah, Florida; products and market interest developed. In October, 1963, there was good response to a booth at the Chicago Safety Show. More capital was needed so Koehler "decided to go all out" and deposited enough securities at the First National Bank of Hialeah, Florida, to make about $100,000 of credit available. From September, 1963, to April, 1964, the new corporation had the normal problems of a new business. Its volume of sales, although mostly samples, was only about $4,000, but its prospects appeared bright. An order for safety vests for the Miami Herald in the amount of $250 had been completed by December, 1963. In February, 1964, S.O.S. received its largest purchase order, from Tri-tix, Inc., for $50,000. Unfortunately, one of the conditions of the order was that the fluorescent material be guaranteed to last for a period of two years. A laboratory report from Chicago was not completed until early April and the order was cancelled in the meantime. Another of S.O.S.'s purchase orders was for $8,000 from L. P. Harless. This order was subsequently cancelled before the factory was able to produce, allegedly because the order had been held by Richard Hunt, the corporation's attorney. Koehler testified that about the first of April, 1964, the prospects for S.O.S. still appeared good and he consequently made another loan of $5,000 at this time. Koehler maintains he made a minimum amount of loans of $30,000 to S.O.S. A letter from Jamul to Angus Stevens, his attorney, states Koehler's loans to be about $35,000. Because of the lapse of time, and either failure to keep good records or loss thereof, this Court can find documentary evidence

only for $22,946.19, exclusive of interest thereon, in loans contributed by Koehler and Sentry Products, a corporation owned by Koehler and his wife. Statement Supplementing Testimony of Robert P. Koehler, Record, at 4. Koehler testified, and his testimony was corroborated, that his bank, the First National Bank of Hialeah, had advised him not to make more loans. Nor would the bank make further personal loans to Koehler for the company, regardless of the amount of collateral, until the company was reorganized and Jamul, who was then president, was placed in charge of research only. Meanwhile, when Koehler was seeking additional investors and a reorganization of S.O.S., the defendants Thomas L. Cummings, Jr. and Newburn Hayes were introduced to S.O.S. by Richard Hunt, whom they consulted on their own legal matters. Negotiations began for an interest in S.O.S., culminating at the "marathon meeting" on April 14, 1964, in an option agreement between Thomas, Koehler, Streeter, and Jamul, shareholders of S.O.S., and Cummings & Co. or its nominees. At this point Jamul had already resigned as president of S.O.S., and pursuant to a shareholders' meeting shortly before, had been made a vice-president in charge of research and development. Koehler was having difficulty controlling Jamul at this time. Jamul was aptly described as a "mad scientist," full of ideas, but flighty and strong-headed. Jamul and Hunt had met with the Cummings group prior to this marathon meeting. Jamul was highly desirous of having these parties in the corporation. The major asset of S.O.S., all parties agree, was the man Jamul and his ideas. This essentially constituted the basis for investment by all the parties. The Cummings group at the close of the marathon meeting was given an option to purchase S.O.S., and $1,650 was placed in escrow in case the option was exercised. On April 21, 1964, Koehler and Streeter sent a telegram cancelling the option. Exhibit 11. This was done following a telephone call from Richard

Hunt informing Koehler that the terms of the agreement were going to have to be changed. Short of negotiations being resumed, further discussions ensued. Jamul, on learning of Koehler's cancellation of the option agreement, was extremely upset. There was an unsuccessful attempt on April 30, 1964, to see if any of the difficulties between Jamul and Koehler could be resolved. Finally, on May 4 and 5, 1964, there was a safety show at the Everglades Hotel in Miami, where Jamul at his own expense exhibited S.O.S. products. Jamul and Ruby Maxey, now Ruby Judkins, an employee of S.O.S. in charge of the sewing operations, met Hayes at this meeting. Hayes stated he dropped by the Everglades show on behalf of Koehler, who had asked Hayes to see if he might get the two men back together again. Koehler's testimony corroborates this. Mrs. Judkins stated it was at this time that Hayes gave Jamul some help in composing a letter to Jamul's attorney, Angus Stevens, concerning anticipated litigation seeking to avoid his employment contract with S.O.S. Hayes meanwhile wrote to Koehler that Jamul had something going on but that Jamul would not tell Hayes. Hayes states in his letter to Koehler, dated May 6, 1964:

"Sorry I didn't have time to get back with you yesterday but as you requested, I went by to chat with Herb Jamul at the Safety Engineers Show. You realize of course that I could not lead Mr. Jamul into expanding his inter-thoughts [sic] but could only be a 'good listener.' Mr. Jamul was non-communicative and frankly I strongly suspect some deep seeded discension [sic]. He apparently has something in mind which he wouldn't elaborate on to me. Maybe you know what it is.

"In view of this I would like to emphasize again that we would not be interested in renegotiating in any way. I think you will agree that we cannot afford to get in the middle on this situation." Exhibit 17, Letter from Newburn K. Hayes, Controller-Trea-

surer of Cummings & Co. to Robert P. Koehler, dated May 6, 1964.

Hayes failed to reveal his helping Jamul draft his letter regarding litigation. Hayes professed to be finding out how the strain between Koehler and Jamul might be relieved, and instead was furthering only the interests of the defendants in obvious conflict with Koehler's interests.

Finally, at the end of April, Jamul was no longer regularly working at the S.O.S. plant. Koehler discovered samples, dies, equipment, and rolls of material missing, although there was no evidence of break-in. An independent inventory was taken, and it was discovered that materials valued at $9,124, including dies worth $2,100, were missing. Mrs. Judkins, who testified that she helped Jamul remove the items, said they moved these samples, materials, and dies to American Arts Advertising. She noted that Jamul claimed these were his property. Apparently these items remained at American Arts about five or six months (including the summer months of 1964). Mrs. Judkins testified these were used at American Arts by its manager, Bob Lipps, in connection with silk screening for a catalogue for use in the "future" at Nashville. She testified that she discussed with Hayes what they were doing at American Arts. Defendant Hayes testified he paid in full more than $2,000 to American Arts for the catalogue. His first contact with American Arts was sometime in the summer of 1964. Later these materials were shipped in twelve or thirteen large cartons, each about three feet square, to Jamul Safety Products in Nashville. Mrs. Judkins stated that not only did Hayes see them, but that the dies and materials were used at Jamul Safety Products. The use of the items at Jamul Safety Products was disputed by defendants Hayes and Cummings. Mrs. Judkins further testified that one of the cartons was lost en route and Jamul Safety Products collected for the loss of the carton, about $100; Hayes kept the check. The Court believes the testimony of Mrs. Judkins.

The next event in the sequence occurred on or about May 22, 1964, when an action was filed by Jamul in the Circuit Court of Dade County, Florida, to avoid the employment contract. Releases of the employment agreement between S.O.S. and Jamul were proposed by Mr. Perse, an associate of Angus Stevens, and sent to Koehler's Florida attorney, Mr. Robert Lane, on July 2, 1964. Defendant Thomas had signed a release of Jamul. On July 9, 1964, at the Kings Bay Yacht Club in Miami, a meeting between Lane, Koehler, Jamul, Cummings, Stevens, and Perse was held. According to Koehler, the purpose of the meeting was to revive the option or renegotiate. Cummings, however, stated the purpose of the meeting was to discuss a release of Jamul. The meeting ended in a deadlock and was terminated by the Cummings group after one hour.

Meanwhile, there is unrefuted evidence in the record that, in the summer of 1964, defendant Newburn Hayes would arrange periodically to leave cash at the Miami International Airport hotel, where he testified a high school friend of his was the night manager. Jamul, on several occasions accompanied by Ruby Judkins, picked up the money that was left at the hotel. Defendants explained the exchange of the cash was an advance on the money they paid Jamul for the future use of his name in Jamul Safety Products, Inc. The total paid for the use of Jamul's name was $2,500. Defendants also stated these amounts were loaned Jamul to keep his spirits up, as the man had become dejected working for Koehler. At any rate, Jamul Safety Products was finally incorporated July 30, 1964, with the following officers: Newburn K. Hayes, President; Herbert Jamul, Vice-President; Thomas L. Cummings, Jr., Secretary; Don Lyda, Treasurer. The directors were: Newburn K. Hayes, Herbert Jamul, Thomas L. Cummings, Jr., Chairman of the Board. Minutes of the First Meeting of Stockholders of Jamul Safety

Products, Inc., August 19, 1964, Exhibit 41. The investors were: Thomas L. Cummings, Jr., George Roberts, E. L. Schneider, and Newburn K. Hayes for $2,500 each. Testimony of Newburn K. Hayes.

On March 2, 1965, at the stockholders' meeting of Jamul Safety Products, Inc., the following were elected to serve as directors of Jamul Safety Products, Inc.: Thomas L. Cummings, Jr., Newburn K. Hayes, George T. Roberts, George Thomas, E. L. Schneider.

On March 2, 1965, the Board of Directors of Jamul Safety Products, Inc. met, and the following officers were elected: Thomas L. Cummings, Jr., Chairman of the Board; Newburn K. Hayes, President; Don Lyda, Treasurer; and George A. Sloan, Secretary.

A catalogue of Jamul Safety Products was introduced into evidence with a number of products which plaintiff Koehler testified were the same, or of the same design and almost identical fabric, as those of S.O.S. Essentially the catalogue represented products available in two different base materials of fluorescent fabric, one of which was used by S.O.S. The other represented a later development by the Minnesota Mining and Manufacturing Company. Hayes also testified that a newly developed 3M product of self-cleaning reflective tape was used. Koehler testified that several items in the catalogue were also made at S.O.S., and that several items were new. One item, previously mentioned above, was a coin jacket #A-401, which had been made by S.O.S. for the Miami Herald paper boys. The picture in the catalogue bears the words across it, "Miami Herald."

On February 11, 1965, the Florida Circuit Court of Dade County handed down a decree holding the covenant not to compete (paragraph 7 of the employment agreement) in Jamul's employment contract with S.O.S. was reasonable. This decree was subsequently upheld on appeal. By September 15, 1965, Hayes cancelled all agreements with Jamul except the agreement to use his name and the one concerning the assignment of patents. Jamul was also at this time given an option to purchase Jamul Safety Products for $150,000. If he chose not to or was unable to purchase the corporation, he would receive $1,000 cash consideration for his common stock and rights in Jamul Safety Products and a royalty of one percent on the sale of materials. Plaintiffs' Exhibit 29. The following cover letter, dated September 15, 1965, appears with the option:

"TO WHOM IT MAY CONCERN:

"On September 3, 1965, Thomas L. Cummings, Jr., George T. Roberts, Emanuel L. Schneider and I, Newburn K. Hayes, as majority stockholders in Jamul Safety Products, Inc., agreed in writing to grant Herbert Jamul a 90 day option for the purpose of finding other investors in Jamul Safety Products, Inc., since we do not propose, at this time, to spend further money on product and/or market research nor to operate a separate corporation if the option is not exercised. We further agreed that our interest in Jamul Safety Products, Inc. was worth $150,000, representing essentially our investment in this venture.

"It is our intention to concentrate on developing our sign business, which is now expanding far beyond original expectations, and to employ all our efforts and managerial talents toward this end.

"We continue to believe there is a terrific potential in the products developed by Jamul Safety Products, Inc. In fact, if Mr. Jamul does not exercise the above option we intend to operate a separate division of Cummings & Co., Inc. under the name of Cummings & Co., Inc.—Safety Materials Division. The products developed and patented will be sold through this division as another product line of our sign business. Mr. Jamul will be paid a royalty on the products he developed prior to September 3, 1965.

"At this time we are no less convinced than we were one year ago that Mr. Jamul has some terrific ideas and that with full time management, the existing corporation has unlimited potential.

"Any further bona fide inquiries will be answered.

"Sincerely yours,

"Newburn K. Hayes
President
Jamul Safety Products, Inc.
and
Controller-Treasurer
Cummings & Co., Inc.
615–254–7717"

Finally, on January 1, 1966, an agreement was made between Jamul Safety Products and Cummings & Co. whereby Jamul Safety Products transferred all rights, patents and royalties for its safety products to Cummings & Co. "for and in consideration of one-half (½) of the pre-tax profits up to a total of Sixty Thousand ($60,000.00) Dollars made by the division of Cummings & Co., Inc. to be set up to pursue the general field of safety items and other accessories for safety and the sign business which may use the processes and developments heretofore owned by Jamul Safety Products, Inc." Memorandum of Agreement, Defendants' Exhibit C.

It is one of defendants' theories that they dealt with Herbert Jamul only after he wrote defendant Newburn Hayes during June or July, 1964, about the possibilities of employment. Defendants maintain they made inquiries of Angus Stevens' firm concerning Jamul's ability to hold other employment. They also note that their Nashville attorney, Henry Hooker, informed them that they might be subject to only "slight exposure" in hiring Jamul. Defendants contend that Stevens represented to them that the employment contract was void under Florida law. Plaintiff Koehler, on the other hand, contends that defendants' connection with Angus Stevens was not merely to determine Jamul's ability to hold other employment, but that defendants and their attorneys in Nashville were in constant touch with the Stevens firm concerning the declaratory judgment, and that Thomas Cummings, Jr. guaranteed Stevens' fee. This is corroborated by Stevens' deposition. The record does contain a number of letters between Stevens' firm and the defendant. Plaintiffs' Exhibits 24, 34 and 35.

Defendants contend that, if any inducement was made, it "flowed the wrong way," from Jamul to defendants, not vice versa; in short, defendants contend that Jamul induced them.

Defendants further contend that at the time Jamul contacted defendants "they had good cause to believe that Herbert Jamul had been effectively discharged by S.O.S. and that the corporation was no longer a functioning business." Pre-trial Order, at 5.

Defendants also contend that the Tennessee inducement to breach a contract statute is not applicable where the corporation concerned is outside the state of Tennessee and the act allegedly transpired outside Tennessee. This statute, to-wit, T.C.A. § 47–15–113, reads as follows:

"47–15–113. *Procurement of breach of contracts unlawful—Treble damages.*—It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of said contract; and the party injured by such breach may bring his suit for said breach and for such damages."

The jurisdiction of this Court, as noted above, is based on diversity of citizenship. Therefore, the controlling

law is that of the forum, Tennessee. Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

The lawsuit ultimately rests on the determination of the validity of the employment contract, which was made and executed in Florida. It was entered into by plaintiff S.O.S., a Florida corporation, and defendant Jamul, a Florida resident at that time. This Court must apply not only the substantive law of the state in which it sits, but also must resolve the conflicts of law according to the conflicts rules of this state. Klaxon Company v. Stantor Electric Manufacturing Company, Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941). Under the Tennessee conflict of laws rules, Florida law applies concerning the validity and enforceability of the Florida contract with the restrictive covenant not to compete. The Tennessee conflicts rule is that the validity and enforceability of a contract is governed by the law of the place where the contract is made, in the absence of any manifestation of contrary intention of the parties. Sloan v. Jones, 192 Tenn. 400, 241 S.W.2d 506 (1951); Moody v. Kirkpatrick, 234 F. Supp. 537 (M.D.Tenn.1964). Indeed, Moak v. Continental Casualty Co., 4 Tenn.App. 287, 292 (1927) states, "The lex loci contractus becomes as much a part of the contract as if specifically incorporated therein, and, in the absence of evidence of contrary intention, the parties must be held to have contemplated the application of that law to the terms of their agreement."

In the case before the Court, the validity of the restrictive covenant has already been tested in the Florida courts by Jamul, and the Florida Appellate Court rendered a final declaratory judgment on November 23, 1965, upholding the restrictive covenant. The determination of the Florida court is binding on defendant Jamul, and constitutes evidence of Florida law as to the other defendants. Since the other defendants were not parties to the Florida decree, it is not binding upon them under the principles of res judicata or collateral estoppel. Under the applicable Florida statute, F.S.A. § 542.12, the following appears:

"(1) Every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind, otherwise than is provided by subsections (2) and (3) hereof, is to that extent void.

"(2) One who . . . is employed as an agent or employee may agree with his employer, to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, so long as the buyer or any person deriving title to the good will from him, and so long as such employer continues to carry on a like business therein."

The Florida Circuit Court, apparently interpreting the above statute, found that the covenant not to compete in the employment agreement between Jamul and S.O.S.:

" . . . is valid and enforceable insofar as it provides that for a period of two years after the plaintiff HERBERT JAMUL ceased to be employed by the defendant S.O.S. INTERNATIONAL, INC., i. e., on August 6, 1964, the plaintiff will not enter the employ of or become an associate, partner, advisor or other agent, or shareholder, of any firm, association, corporation or any other organization which manufactures or sells, as agent or principal, within the geographical area specified, the same fabricated reflective safety items, including but not limited to vests, gloves, and other garments as well as flags, banners and advertising displays produced or sold by the defendant." Amended Final Declaratory Decree, Circuit Court of Dade County, Florida, February 11, 1965. Plaintiffs' Exhibit 28.

The Court had found that the covenant not to compete in the employment agreement "is reasonable, with regard to time and area . . . . " Since the Florida court, interpreting a Florida statute found the covenant reasonable as to time and area, and since this Court finds no contrary authority interpreting a similar covenant under Florida law, this Court finds the Florida decree persuasive on the issue of the reasonableness of the covenant not to compete. This Court has examined the relevant Florida cases, and has considered anew the covenant not to compete, and its reasonableness as to time and place on the issue of its validity and enforceability in Florida. This Court is persuaded that the Florida Circuit Court for Dade County made the proper determination under Florida law. Defendants contend that "it is clear that Herbert Jamul breached the first of his covenants long before he knew any of the defendants and that the plaintiffs had likewise failed to perform the contract prior to the arrival of any of the defendants on the scene." Defendants' Memorandum Brief of Law and Facts, at 2. Defendants point to Jamul's alleged failure to develop and produce new safety products, and to plaintiffs' failure to continue Jamul as president, or pay him the weekly salary of $150 provided for in the contract, after April 4, 1964. In examining the employment contract between S.O.S. and Jamul, the Court finds that Jamul's employment was terminable for cause at any time during the two-year period that the employment agreement was effective, and would "terminate on August 30, 1965 . . . . " Employment Agreement, Plaintiffs' Exhibit 2. At the first meeting of the Board of Directors of S.O.S., the officers, including Jamul as president, were elected "to serve for one year and until their successors are elected and qualified." Minutes of First Meeting of Board of Directors, S. O.S. International, Inc., Plaintiffs' Exhibit 3. It is sufficient to point out that even if Jamul's employment with S.O.S. terminated on April 4, 1964, the contract still required that he not compete for a period of two years thereafter, which would be at least until April 4, 1966.

■ There is sufficient evidence in the record to establish the fact that Jamul had become uncooperative with Koehler, who was then president of S.O. S., and that some time later Jamul's salary was stopped. This constituted termination of his employment and it constituted termination for cause. Following his termination, there was a duty on Jamul to refrain from entering the employ of "any organization which manufactures or sells . . . the same fabricated reflective safety items," and a duty on all other individuals with knowledge of his employment contract, and the restrictive covenant contained therein, not to induce him to breach this covenant. The Court finds that defendants did not sustain their burden of proof at trial for their contention that the contract was breached by plaintiffs.

■■ All that remains for consideration on the choice of law issue regarding the validity of the employment contract is to examine the Tennessee decisions to insure that the application of the Florida law does not violate the public policy of Tennessee. It is a well-established conflicts rule that the law of the place where the contract was made applies unless it is contrary to the strong public policy of the forum. "The public policy of a State, established either by express legislative enactment, or by the decisions of its courts, is supreme, and when once established will not, as a rule, be relaxed even on the ground of comity to enforce contracts, which, though valid where made, contravene such policy." Moak v. Continental Casualty Company, 4 Tenn.App. 287, 292–293 (1927).

■ The public policy of Tennessee is violated, and Tennessee will not enforce the restrictive covenant in a contract where there is a general or unlimited restraint of trade.

"The general rule on this subject, deducible from the authorities, is that a contract in general restraint of trade, that is, not to engage in one's trade or profession at any place in the realm, is void as being contrary to public policy; but a contract not to engage in one's business or profession, at a particular place, or for a period of time, is not invalid as being contrary to public policy, but such contracts will be upheld and enforced. 2 Parsons on Contracts, 748 et seq., note Z; 2 Pomeroy, Eq. Jur. § 934; 3 Pomeroy, Eq. Jur. § 1344, and note." Turner v. Abbott, 116 Tenn. 718, 94 S.W. 64, 66 (1906); also quoted in Ramsey v. Mutual Supply Company, 58 Tenn.App. 164, 427 S.W.2d 849 (1968).

Thus, the restraint of trade under the covenant not to compete does not violate the public policy of Tennessee unless the restraint is unreasonable. Baird v. Smith, 128 Tenn. 410, 161 S.W. 492 (1913); Herbert v. W. G. Bush & Company, 42 Tenn.App. 1, 298 S.W.2d 747 (1956); T.C.A. § 69–101 and the cases decided under it; 31 Tenn.L.Rev. 450, 454 (1964). This Court finds that while the Florida contract is broad, it is duly limited as to time and area and is not invalid or violative of Tennessee public policy. Discussion of the same legal principles is involved under both the issue of Tennessee public policy on restrictive covenants, and the issue of the validity of such a restrictive covenant under a cause of action for inducement to breach. Therefore, for the purpose of greater clarity, the Court's discussion of the reasonableness of the restrictive covenant will be reserved until the inducement to breach discussion.

### INDUCEMENT TO BREACH EMPLOYMENT CONTRACT

 Inducement to breach a contract, while it must be based upon a valid contract, is an action sounding in tort. Finchum Steel Erection Corp. v. Local Union 384, 202 Tenn. 580, 308 S.W.2d 381 (1957); Prosser, The Law of Torts, § 123 (3rd ed. 1964). The applicable Tennessee statute, T.C.A. § 47–15–113, is but a statutory enactment of the common law tort action, expressly setting treble damages in lieu of punitive damages. Swift v. Beaty, 39 Tenn. App. 292, 282 S.W.2d 655 (1954). Tennessee follows the traditional conflicts of law rule, the law of the place of the wrong governs an injury sounding in tort, lex loci delicti. Kennard v. Illinois Central R.R. Co., 177 Tenn. 311, 148 S. W.2d 1017 (1941); Franklin v. Wills, 217 F.2d 899 (6th Cir. 1954); Restatement, Conflict of Laws, § 378. Where there is a multi-state tort, the place of the wrong is "the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement, Conflict of Laws, § 377. In the present case, the last event necessary to establish the liability of the defendants was at that time and place where the defendants formed Jamul Safety Products, Inc., and employed Herbert Jamul. The inducement to breach the covenant of his employment contract was complete where Jamul was employed by defendants, resulting in the breach of his covenant with S.O.S. Jamul sought employment with defendants in a non-restricted area. The Court finds that he was employed within the prohibited area. The Court further finds that the last act establishing the cause of action for inducement to breach was Jamul's employment in violation of the restrictive covenant. As Jamul Safety Products was incorporated under the laws of the state of Tennessee with its principal place of business in Nashville, Tennessee, Tennessee law governs the tort of inducement to breach a contract, and also the tort of conspiracy to deprive plaintiffs of their rights under the contract. The applicable Tennessee statute on inducement to breach a contract is § 47–15–113 T.C.A., as cited above.

Plaintiffs' cause of action owes its existence in great part to the landmark case, Lumley v. Gye, 2 El. & Bl. 216, 118 Eng.Rep. 749, 1 Eng.Rul.Cas. 707 (1853). Prosser notes the following

concerning the underlying contract in this cause of action:

"Lumley v. Gye and the succeeding cases laid emphasis upon the existence of the contract, as something in the nature of a property interest in the plaintiff, or a right in rem good against the world. . . . The addition of the element of a definite contract has its importance, since the person induced to break it is then under a legal duty, and the plaintiff has furnished a consideration for the expectancy with which the defendant interferes. It may therefore curtail the defendant's privilege to pursue his own ends at the expense of the plaintiff." (Footnotes omitted.) Prosser, The Law of Torts, § 123 at 954–55. (3rd ed. 1964).

Then, the first element necessary to establish a cause of action for inducement to breach a contract is the existence of a valid and enforceable contract. Turner v. Abbott, 116 Tenn. 718, 94 S.W. 64 (1906). The rationale for the Court's decision that the contract does not violate the public policy of Tennessee, and the issue of whether the restrictive covenant is reasonable in light of the Tennessee decisions will now be considered. At the outset it must be noted that the covenant is reasonable if it is sufficiently limited in time and place. Kaset v. Combs, 58 Tenn.App. 559, 434 S.W.2d 838 (1968); Allright Auto Parks, Inc. v. Berry, 219 Tenn. 280, 409 S.W.2d 361 (1966).

"There is no inflexible formula for deciding the ubiquitous question of reasonableness, insofar as noncompetitive covenants are concerned. Each case must stand or fall on its own facts. However, there are certain elements which should always be considered in ascertaining the reasonableness of such agreements. Among these are: the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest." Allright Auto Parks, Inc. v. Berry, 219 Tenn. 280, 409 S. W.2d 361, 363 (1966).

The controlling considerations, however, are the limitations imposed on the time and the area encompassed by the agreement.

The consideration supporting the employment agreement was the employment of Jamul as an officer of S.O.S., with a salary approved by the Board of Directors at $150 per week. In addition, Herbert Jamul was receiving an opportunity to have capital available to develop his ideas.

Employment, even for an indefinite period, has been held sufficient consideration in Tennessee to support a covenant against competition. Di-Deeland, Inc. v. Colvin, 208 Tenn. 551, 347 S.W.2d 483 (1961); Ramsey v. Mutual Supply Company, *supra*

The danger to the employer, S.O.S., has already been seen. S.O.S. had one valuable asset, the ideas of the man Jamul. About $30,000 was allegedly invested by Koehler to develop these ideas. When defendants formed Jamul Safety Products, Inc. and until it was sold to Cummings & Co., another $150,000 was invested in Jamul's ideas. Since these men were certainly not inexperienced in business ventures, it can only be concluded that at the time the loans and profit investments were made, these ideas were believed to have great potential. The key to this potential was Jamul. When plaintiff Koehler loaned this amount of money, he did so because of Jamul's ideas. When the defendants, other than Jamul, were interested in acquiring S.O.S., and entered into the option to purchase S.O.S., there was no contention that they were bargaining for the rented buildings or rented sewing machines of S.O.S. What they were clearly bargaining for and considered valuable were the abilities and ideas of Herbert Jamul.

"Q Then you were aware that Mr. Herbert Jamul did have an employment agreement with S.O.S. International, and a restrictive covenant with regard to engaging in virtually any capacity for anyone else along the same lines, and in certain states?

"A Of course we did, that was part of the—brought out clearly in the purchase negotiations. That was one of the things that they had to sell, supposedly.

"Q Exclusive rights to his ideas and services?

"A Right.

"Q You understood that, at least at that time, when you negotiated in April?

"A Of course I did."

Deposition of Thomas L. Cummings, Jr., taken on April 6, 1967, at 27.

Defendants now say that Jamul cost them money, that others had his ideas, and that they made a mistake. Whether this is true or not, at the time they were negotiating with S.O.S. they were willing to bargain because of Jamul's covenant with S.O.S.; and by inducing a breach of Jamul's covenant with S.O.S., they were at the very least responsible for depriving S.O.S. of the opportunity to negotiate with other organizations that might also have been interested in investing in Jamul's ideas. They ended up with the one valuable asset of S.O.S. The threatened danger to the employer, S.O.S., lay in experiencing competition from its own former idea man, against which the covenant protected it.

The economic hardship imposed on Jamul was stressed by the defendants Hayes, Cummings and Thomas. Jamul, on the stand, testified to a number of past occupations. He now does independent consulting work in Connecticut. He was not deprived of his only opportunity of employment by the two-year restrictive covenant. The argument of economic hardship to Jamul does not persuade this Court that the defendants' sole motivation for employing Jamul was their underlying humanity, because of the hardship suffered by Jamul. If motivated solely by humanitarian reasons, defendants might have employed Jamul with Cummings & Co. in a position unrelated to the safety products business. Indeed, when Jamul wrote Hayes on May 14, 1964, concerning his employment, after negotiations were unsuccessful between Koehler and the defendants, he said:

"Finally, after 2 long weeks I received a letter from my attorney Mr. Stephens, copy of which I am enclosing to you and which is self explanatory. As you can well see, I cannot do business with anyone, till the declaratory degree [sic] has been granted by the Dade County Circuit Court, which will take at least another week . . . . However, it can be possible that it will take longer than a week . . . . As you can see that I have not been paid any salary by the Corporation and that I have no income of any kind and that I have spent all my savings on behalf of S.O.S. Corp. I am writing to you now as a friend and ask your advice as to what can I do in the interim time, while I waite for the 'decree.' It occured [sic] to me, perhaps I could be a consultant to one of the companies, you have connections with or in which you may have interest. *It can be in any field, as you know I have at least 20 years of experience in consulting field and creating new products and ideas.* And I dont think that there is any conflict of interest involved either." (Emphasis supplied.) Defendants' Exhibit B.

Clearly, Jamul was asking for a job as a consulting engineer or as a developer of new products with Cummings & Co. or one of the companies Hayes had "connections with." Jamul stated he did not wish to work in the area governed by the employment agreement until the decree was entered in the Florida court. Yet defendants employed Jamul, with knowledge of the litigation, to work with the same or similar products with which

he worked at S.O.S. The economic hardship argument is not persuasive.

Finally, in considering the limitations as to time and area on the restraint of trade, several Tennessee cases have held that a covenant not to compete for as much as five years after the termination of employment is not unreasonable. Matthews v. Barnes, 155 Tenn. 110, 293 S.W. 993 (1926); Ramsey v. Mutual Supply Company, *supra*. The area limitation, however, is rather broad as Jamul agreed not to compete in thirty states plus the District of Columbia. In Allright Auto Parks, Inc. v. Berry, *supra*, the contract sought to limit competition in 46 cities, from coast to coast and from the Gulf of Mexico into Canada. The defendant there had only been required under the contract to work in three cities so the contract was held to be unreasonable and therefore unenforceable. In another case, the agreement of noncompetition included twelve hundred cities. The Fourth Circuit Court of Appeals held the territory included was so vast as to render the contract void. Welcome Wagon, Inc. v. Morris, 224 F.2d 693 (4th Cir. 1955), also noted in Ramsey v. Mutual Supply Company, *supra*. The criterion here is whether or not the territorial limits are greater than is necessary to protect the employer's business. See Allright Auto Parks, Inc. v. Berry, *supra*, citing Matthews v. Barnes, *supra*; Arkansas Dailies, Inc. v. Dan, 36 Tenn.App. 663, 260 S.W.2d 200 (1953); Federated Mutual Implement and Hardware Ins. Co. v. Anderson, 49 Tenn.App. 124, 351 S.W.2d 411 (1961); 17 C.J.S. Contracts §§ 238–258 (1963); and Restatement Contracts § 515. In addition, some cases state that "noncompetition covenants, which embrace territory in which the employee never performed services for his employer, are unreasonable and unenforceable." Allright Auto Parks, Inc. v. Berry, *supra* 409 S.W.2d at 36; 43 A.L.R.2d 175, § 66. Finally, the Supreme Court of Tennessee in the *Allright* case cites 17 C.J.S. Contracts § 254 (1963):

"Area limitations are reasonable if restricted to the area in which the employee was engaged in the course of his employment; but, unless trade secrets are involved, a covenant restricting an employee beyond the area of his former operations is invalid, even though the employer's business extends throughout the area designated."

In the *Ramsey* case two years later, a restrictive covenant including an area never previously worked by the employee was held valid. Without noting the language quoted in *Allright* from C.J.S. concerning the presence of trade secrets, the court in the *Ramsey* case found that the area not yet covered by the covenanting salesman might have later been assigned him if the present salesman in that area were ill or temporarily absent. Also, "in addition to this fact, the frequent meetings at which both Billingsley [present salesman] and Ramsey [former employee against whom covenant is sought to be enforced] discussed customers and mutual problems would result in the appellant gaining some information, by virtue of his employment, which could be used by him as a competitor after termination of such employment." Ramsey v. Mutual Supply Company, *supra*, 427 S.W.2d at 853. The *Ramsey* opinion further cites the rule that a restrictive covenant is not invalid although it covers an area in which the employee had not yet established a business contact, where it was reasonable to anticipate that such territory might be covered by him at some future time during his employment. In light of the above, the *Ramsey* court notes that the territorial limitations of the contract should be determined by the situation existing at the date of the contract; it held that the covenant restricting competition was valid.

In Allright Auto Parks, Inc. v. Berry, *supra*, the court noted:

"Numerous cases could be cited where covenants have been declared unreasonable because of their exces-

sive territorial limits; however, these provide little direction since the question of reasonableness must be decided on an *ad hoc* basis. As is stated by Professor Williston in his learned treatise on contracts, the ultimate question in each case should be 'what is necessary for the protection of the promisee's rights and is not injurious to the public.' Williston on Contracts, Vol. 5, § 1643, pp. 4606, 4608." Allright Auto Parks, Inc. v. Berry, *supra,* 409 S.W.2d at 364.

■ In the present case, Jamul traveled in many states visiting numerous customers. He exhibited S.O.S. products at safety shows in a number of cities across the country. He was far more than a salesman, however; he was the market researcher and inventor for the company. The advantage to S.O.S. at the time of the making of the contract with Jamul was the novelty of Jamul's ideas in the safety area. Testimony and exhibits demonstrated that various concerns in cities from Florida to Texas, Canada, Illinois, and New Jersey were considering the products of S.O.S. Since the market place is large in area, it appears to this Court that the agreement not to compete made by Jamul was not unreasonable in order to protect S.O.S.'s business interests in the specialized safety field. Where a covenant not to compete was entered into by an idea man, the principal asset of a corporation in a highly technical and specialized field, it seems inescapable that, in an effort to protect the investments by the corporation and by the plaintiff Koehler, the covenant was not unreasonable, though broad in its territorial limitation.

■ ■ Finally, the defendants offered no proof that the restrictive covenant was unreasonable, especially in light of the specialized field involved and in light of Jamul's abilities. Plaintiff has the burden of proof to establish a cause of action for inducing a breach of contract. Once plaintiff carries the burden, as here, the burden of going forward shifts to defendants to prove the contract was unreasonable. Prosser, *supra;* Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154 (1904). This the defendants did not do.

■ Another element of plaintiff's action is that the defendants must have caused the interference with Jamul's contractual relationship with S.O.S.

"It is not enough that he [defendant] merely has reaped the advantages of the broken contract after the contracting party has withdrawn from it of his own motion. Thus acceptance of an offered bargain is not in itself inducement or the breach of a prior inconsistent contract, and it is not enough that the defendant has done no more than enter into one with the knowledge of the other, although he may be liable if he has taken an active part in holding forth an incentive, such as the offer of a better price or better terms . . . .

"*Some of the earlier decisions denying liability argued that the defendant's conduct can never be a proximate cause of the breach.* Since there is an intervening voluntary act of the third party promisor; but where that act is intentionally brought about by the defendant's inducement, or is even a part of the foreseeable risk which he has created, it seems clear that the result is well within the limits of the 'proximate.' It is a question of fact, and so normally for the jury, whether the defendant has played a material and substantial part in causing the plaintiff's loss of the benefits of the contract." (Footnotes omitted.) Prosser, The Law of Torts, *supra,* at 958–59.

It will be recalled that Herbert Jamul wrote defendant Hayes concerning any type of consulting position, but not for a position in violation of his covenant with S.O.S. Jamul stated at trial that he asked defendant Cummings "sometime later" than the May 4 and 5 safety show at the Everglades Hotel if he could work as a consultant for Cummings &

**1310**

Co. Cummings' reply, according to Jamul, was for Jamul to write Cummings a letter and also to get legal advice regarding his employment, and Cummings would consider it. Finally, however, on direct examination Jamul stated that he asked for a job with Cummings & Co. ("if I have a job or don't have a job"), and he stated that defendants did not solicit him. The Court finds that the more credible evidence on this last point shows defendant *was* solicited by the defendants as evidenced by the cash payments made to Jamul over the summer months of 1964, and Jamul's eventual employment in the prohibited area. Defendants also considered the amount of "exposure" to which this subjected them. Defendants induced Jamul to work in the area he expressly told them he could not work. Jamul apparently had little choice; he could work for the defendants in the safety products area or not at all. Therefore, the Court finds that while Jamul may have contacted the defendants, not vice versa, he came to the defendants for a very different position and not a position in violation of his employment agreement.

An evaluation of all of the evidence at trial indicates that after the May 5th show at the Everglades Hotel, the defendants were committed to Jamul's ideas on the application of reflective tape to fluorescent and phosphorescent materials in the safety field and continued to try to negotiate with Koehler for S.O.S. (July 8, 1964 meeting at the Kings Bay Yacht Club). When they could not obtain a release of Jamul or could not revive the option or renegotiate further, defendants supported Jamul, intending to use his name in their future company, Jamul Safety Products, which was incorporated July 30, 1964. This Court agrees with plaintiffs that there is ample evidence in the record that the defendants intentionally induced Jamul to work with them in the safety products area, utilizing his ideas in those areas in which he had covenanted not to compete with S.O.S.

It is useless to speculate whether Jamul might have continued employment with S.O.S. if he had not been prevented by defendants' wrongful acts. It seems clear from the proof that Jamul was desirous of working on the development of the fluorescent and reflective tape in the safety products field. It is also clear that he did not wish to do this for S.O.S. as it was then composed. However, the Court cannot speculate that Jamul would not have worked for a newly reorganized or newly managed S.O.S. after the Florida courts decided against him, and had defendants not presented Jamul with a lucrative alternative. The Court cannot then decide whether Jamul might or might not have continued to work for S.O.S.; but it is clear to this Court that Jamul's failure to return to work for S.O.S. was directly caused by defendants' wrongful inducement. Defendants did then "play a material and substantial part in causing the plaintiff[s'] loss of the benefits of the contract." Prosser, *supra,* at 959.

Much proof was introduced at trial on behalf of the defendants to attempt to establish that Jamul never worked on products that were the "same" as those produced by S.O.S. Defendants maintain that while some of the garments advertised in a catalogue, Exhibit 27, under the name Jamul Safety Products, were the same style as those made by S.O.S. (e. g. the vest with "Miami Herald" on it), these garments were made out of a new orange flourescent base fabric not in existence at the time Jamul was with S.O.S. They also contend that the use of a new reflective tape was different. Defendants contend that at most these items were "similar" to those made by S.O.S., but that the items were not the "same," as the prohibition was described in the employment agreement at paragraph seven. The intention of the parties and the language in the agreement controls the interpretation of the words of a contract. Harper v. Lindsey, 19 Tenn. 310 (1938); A. J. Armstrong Co. v. Knox County, 291 F.

Supp. 1008 (E.D.Tenn.1968). The parties obviously, even in the language used, did not mean "same" to have the restrictive interpretation of "exactly the same." There is ambiguity in whether "same" modifies "items" or refers to "fabricated." The intent of the parties by the phrase "the same fabricated reflective safety items" was to prevent competition where items were produced that were fabricated "the same." In other words, "same" appears to refer to "fabricated" rather than "items." Jamul was prohibited from employment in a company which sold safety items that were *made* the same as those of S.O.S.; this would include items that were made exactly the same but with a new base fabric or with a new reflective tape.[1] To follow defendants' contention would be to totally emasculate the contract.

In this connection, there was also considerable testimony on behalf of the defendants that the directors of Jamul Safety Products repeatedly cautioned Jamul against using any materials or products he had developed at S.O.S.

> "The desire of the defendants to avoid any conflict with the plaintiffs' interests was so strong that they abandoned the safety garment field after a protest from Mr. Koehler . . . . This was done despite the fact that new and different reflective materials were being used to make the garments. *For the remainder of the time Herbert Jamul was employed by the defendants he did no work on products that were the 'same,' or even similar to those produced or sold by S.O.S. International."* (Emphasis supplied.) Defendants' Memorandum Brief of Law and Facts, at 3, 4.

On the other hand, however, defendants paid for the shipment of the boxes of materials and dies of S.O.S. from American Arts Advertising to Nashville. While Jamul and the other defendants maintained that these boxes were the personal property of Jamul, when one box was lost, defendant Hayes claimed the loss on behalf of Jamul Safety Products, not on behalf of Herbert Jamul. The contents of the boxes paralleled the missing items inventoried at S.O.S. The catalogue of Jamul Safety Products was made from samples, such as the Miami Herald vest, which were the property of S.O.S., and were produced by S.O.S. These facts definitely raise a question as to the desire of the defendants to avoid any conflict with the products of the plaintiffs.

■■■ A further contention of the defendants is that there are no ascertainable damages, and that at most plaintiffs are entitled to merely nominal damages. Defendants maintain that plaintiffs' damages are speculative, and that plaintiffs have failed to provide the Court with any basis upon which to assess those damages which were proximately caused by the defendants' wrongful acts. The Tennessee statute sets the damages recoverable as those "resulting from or incident to the breach of said contract . . . ." T.C.A. § 47–15–113. This language clearly includes lost profits if they are capable of ascertainment with some degree of certainty. An exact, fixed amount as the damages sustained is often difficult to establish and remains a controversial figure. See 25 C. J.S. Damages §§ 80–81. Regarding the issue of the certainty of the damages, the following language is helpful:

> " 'Compensation may be for a pecuniary injury which has resulted as the natural or probable result of a wrong, although the extent of the injury is not capable of precise proof.' 15 Am. Juris., page 797, sec. 356.

> " 'There is a clear distinction between the measure of proof necessary to establish the fact that the plaintiff has sustained some damage and the measure of proof necessary to enable the jury to fix the amount. Formerly, the tendency was to restrict the recovery to such matters as were susceptible of having attached to them an

---

1. See Addendum to Memorandum attached hereto.

exact pecuniary value, *but it is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount and that where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery*. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier of facts to make a fair and reasonable estimate, and the plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.' 15 Am.Juris., pages 414, 415, sec. 23." (Emphasis supplied.) Stevens v. Moore, 24 Tenn.App. 61, 139 S.W.2d 710, 719 (Tenn.Ct. of Appeals, 1940).

■ In Tennessee it is established then that the prohibition against assessing speculative damages applies only where the fact of damage is uncertain, but not where the amount alone is uncertain. Coverdell v. Mid-South Farm Equipment Ass'n., 335. F.2d 9 (6th Cir. 1964); Acuff v. Vinsant, 59 Tenn.App. 727, 443 S.W.2d 669 (1969).

■■ The Tennessee treble damage statute is but a declaration of the common law, except as to the amount of damages recoverable. Emmco Insurance Co. v. Beacon Mutual Indemnity Co., 204 Tenn. 540, 322 S.W.2d 226 (1959). Determining the standard for the assessment of damages provides the Court with its greatest problem. A number of Tennessee cases have recognized that lost profits may be assessed. Inland Equipment Co. v. Tennessee Foundry and Machine Co., 192 Tenn. 548, 241 S. W.2d 564 (1951); Gardner v. Deeds and Hirsig, 116 Tenn. 128, 92 S.W. 518 (1905); Lee Shops, Inc. v. Schatten-Cypress Co., 350 F.2d 12 (6 Cir. 1965). However, here we have a new business which never was permitted to achieve its profit potential. Defendants contend that Jamul Safety Products never did either, and that it was Jamul's fate never to realize profits for anyone. However, the business for which he worked, Jamul Safety Products, eventually sold its assets to Cummings Allied Products, a division of Cummings & Co. The new division, Allied Products, also entered into the sign barrier and safety products of asbestos areas where S.O.S. never had products. Even if the Court could separate the asbestos and the sign barrier business of Allied Products from the area of the safety business in which S. O.S. was involved, lost profits as a standard of damages would prove too speculative and uncertain. Plaintiffs have cited Lee Shops, Inc. v. Schatten-Cypress Company, *supra,* for the principle that lost profits may be assessed even where the company never was able to do business because of a breach of contract. However, this case is obviously distinguishable from the present case since in *Lee Shops* the new business was one discount store of an entire corporation of similar enterprises. For this reason, by a comparison with similar operations then in existence, there were some bases for estimating profit potential. Here, we have a new corporation with a bright idea in a developing area of the safety field. Clearly lost profits as a basis of damages could only be speculative. Finally, the general rule is that no recovery for lost profits is allowed for injury to a new business with no previous history of profits. 22 Am. Jur.2d Damages § 173; Burge Ice Machine Co. v. Strother, 197 Tenn. 391, 273 S.W.2d 479 (1954).

The Court finds the proof in the record sufficient to establish that plaintiff S.O.S. has actually been damaged. However, the proof was not sufficient to ascertain the exact amount owing plaintiffs. Therefore, in accordance with plaintiffs' request, a master is hereby

appointed to establish the exact amount of damages suffered by plaintiff S.O.S.

## CONSPIRACY

In order to establish an action for civil conspiracy, there must be "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." Brumley v. Chattanooga Speedway & Motordrome Co., 138 Tenn. 534, 198 S.W. 775, 776 (1917); Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S.W.2d 344 (1948); Hux v. Butler, 220 F.Supp. 35 (W.D.Tenn.1963), reversed on other grounds, 339 F.2d 696 (6 Cir. 1964.)

In connection with the concerted action, it is not "essential that each conspirator have knowledge of the details of the conspiracy, but a common purpose is essential and that each has the understanding that the other has the purpose and such purpose must be supported by concerted action." Hux v. Butler, 220 F.Supp. 35, 41 (W.D.Tenn. 1963). The requisite elements of the cause of action are common design, concert of action, and an overt act. Brumley v. Chattanooga Speedway & Motordrome Co., *supra*; Hux v. Butler, *supra*.

Furthermore, without injury to person or property, resulting in attendant damage, a cause of action for civil conspiracy is not established. Tennessee Publishing Co. v. Fitzhugh, 165 Tenn. 1, 52 S.W.2d 157 (1932); Donnelly v. Jackson Brothers, 2 Tenn. CCA (Higgins) 408 (1911); Hutton v. Waters, 4 Tenn. CCA (Higgins) 582 (1914); Smoky Mountains Beverage Co. v. Anheuser-Busch, Inc., 182 F.Supp. 326 (E. D.Tenn.1960).

The majority rule recognizes the existence of a cause of action for conspiracy to procure or induce a breach of a contract on the part of a party who is injured thereby. 15A C.J.S. Conspiracy § 13 (1961). Indeed, the Missouri Supreme Court noted, "A person who by conspiring with another or by collusive agreement with him assists him to violate his contract with a third person and to obtain the benefit of that contract for himself commits an actionable wrong." Anheuser-Busch, Inc. v. Weber, 364 Mo. 573, 265 S.W.2d 325, 364, reversed on other grounds, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955).

Where the defendants employed Jamul in breach of his employment contract, knowing of the existence of such contract, an action for conspiracy is established. The common purpose of the conspiracy was to deprive S.O.S. of its key employee Jamul, and further, to secure this employee for the defendants' future business. To accomplish this purpose, defendants "loaned" cash amounts to Jamul over the summer until they could incorporate Jamul Safety Products. The cash payments constitute an overt act done in furtherance of the common unlawful purpose.

The damage to plaintiff S.O.S. is evident. It was deprived of the very basis of its existence, a fact that is conceded by defendants. Consequently, it is the finding of this Court that defendants Hayes, Cummings and Thomas knowingly conspired to deprive plaintiff S.O.S. of its employee and induced Jamul to breach his contract.

The damages, when the exact amount is ascertained by the master, will be assessed.

Because Jamul under Tennessee law cannot be liable for inducing his own breach of contract, the cause of action for inducing a breach of contract against defendant Jamul is hereby dismissed. There appears to be some question as to whether Jamul can also be liable for conspiracy where the alleged wrongful act was the inducement of a breach of contract. 15A C.J.S. Conspiracy § 13 (1961). This Court finds the better approach in theory is to dismiss the conspiracy cause of action also as to Jamul. If a party cannot be liable for inducing the breach of his own contract, it is similarly difficult to understand how he might be liable for participating

in a conspiracy to induce the breach of his own contract. Plaintiffs assert a cause of action for conspiracy to deprive them of their property or property rights against the defendants, including Jamul. In the conspiracy action considered above by the Court, the claim for so conspiring cannot include the property taken by Jamul as one of the co-conspirators since the only conspiracy in which defendants were involved was that of inducing a breach of the covenant not to compete. The proper allegations against Herbert Jamul might be a breach of his employment contract, conversion of property and so forth, but not a conspiracy to deprive plaintiffs of their property or property rights. Accordingly, the claims against defendant Herbert Jamul are hereby dismissed.

There is little or no proof as to the liability of defendants Roberts and Schneider and their role either in the conspiracy claim or in the inducement to breach cause of action. Therefore, the claims of the plaintiffs as to these defendants are hereby dismissed.

 The causes of action for inducing the breach of a contract right of S.O.S. International, Inc. and for conspiracy to induce breach of contract are rights which are enforceable only by plaintiff S.O.S. Where the cause of action is being prosecuted on behalf of S.O.S. as a legal entity, plaintiff Robert P. Koehler, while the principal shareholder and creditor of S.O.S., does not have standing to bring suit as an individual or a shareholder. T.C.A. § 48–718. Also, this Court finds that plaintiff Sentry Products as a mere creditor does not have standing to assert a claim for inducement to breach a contract, which right is owing solely to S.O.S. Accordingly, this action is dismissed as to plaintiffs Robert P. Koehler and Sentry Products Corporation.

While the defendants Hayes, Cummings, and Thomas, in accordance with the reasons set forth above, have been found liable to plaintiff S.O.S. under both the claim of inducing the breach of

the contract and the conspiracy claim, the Court finds the damage to plaintiff S.O.S. is the same under each claim. Therefore, the Court holds the damage to plaintiff S.O.S. under both claims to be concurrent. Proof will be submitted by the plaintiff S.O.S. to the master appointed to ascertain the amount of damages.

## ADDENDUM TO MEMORANDUM

Consistent with such intent is the "Shareholders Agreement" which predated the Employment Agreement (both being signed by Jamul) which provided in Amendment IX(15):

"(b) Jamul shall not at any time establish any other business in competition with, or selling the same products or services as the Corporation."